No. 2022-2241

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

PRO-TEAM COIL ENTERPRISE, INC., PT ENTERPRISE INC.,
PRIMESOURCE BUILDING PRODUCTS, INC., S.T.O. INDUSTRIES, INC.,
Plaintiffs,

UNICATCH INDUSTRIAL CO., LTD., TC INTERNATIONAL, INC., HOR
LIANG INDUSTRIAL CORPORATION, ROMP COIL NAIL INDUSTRIES,
INC.,
Plaintiffs-Appellants.

v.

UNITED STATES, MID CONTINENT STEEL & WIRE, INC.,
Defendants-Appellees.

Appeal from the United States Court of International Trade in
Case No. 18-cv-00027, Chief Judge Mark A. Barnett

CORRECTED NON-CONFIDENTIAL BRIEF FOR
DEFENDANT-APPELLEE UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

OF COUNSEL:
VANIA WANG
Senior Attorney
U.S. Department of Commerce
Office of the Chief Counsel For Trade
    Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7658
Email: Sosun.Bae@usdoj.gov

April 12, 2023

Attorneys for Defendant-Appellee

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES ......................................................... iii

STATEMENT OF RELATED CASES.............................................x

CONFIDENTIAL MATERIAL OMITTED  .....................................x

STATEMENT OF THE ISSUES ....................................................1

STATEMENT OF THE CASE.........................................................2

    I.    Nature Of The Case....................................................................2

    II.    Legal Framework For Calculation Of Antidumping Duties..............3

        A.    Commerce's Issuance Of The Antidumping Duty Order .........3

        B.    Statutory And Regulatory Scheme For Conducting Administrative Reviews.......................................................4

        C.    Legal Framework For Application Of Facts Available And An Adverse Inference.........................................................5

        D.    Calculation Of A Rate For Companies Not Individually Examined .........................................................................8

    III.    Statement Of Facts And Course Of Proceedings Below...................9

        A.    Initial Administrative Proceedings Below Commerce.............9

        B.    First Remand Opinion And Remand Results........................14

        C.    Second Remand Opinion And Remand Results....................15

        D.    Third Remand Order And Remand Results...........................17

i

E.     Fourth Trial Court Opinion ...............................................18

SUMMARY OF ARGUMENT ....................................................19

ARGUMENT...........................................................................20

I.      Standard Of Review..................................................20

II.     Commerce's Application Of Facts Available With An Adverse
        Inference To Unicatch Was Supported By Substantial Evidence .....22

        A.     Commerce Properly Applied Facts Available .....................22

        B.     Commerce Appropriately Applied An Adverse Inference......31

III.    Commerce's Selection And Corroboration Of The AFA Rate Was
        Lawful And Supported By Substantial Evidence..........................38

        A.     Relevant Legal Framework For Corroborating A Rate..........38

        B.     Commerce Corroborated The 78.17 Percent Petition Rate.....40

        C.     The 78.17 Percent Rate Is Not Punitive.............................45

IV.     Commerce's Use Of The Expected Method To Calculate The Rate For
        Non-Selected Respondents Was Lawful And Supported By
        Substantial Evidence ..................................................49

        A.     The Expected Method Is The Default, And Assumes The
               Largest Respondents Are Representative............................49

        B.     Commerce Properly Used The Expected Method To Calculate
               The Non-Examined Respondents' Rate.............................51

CONCLUSION.......................................................................54

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Committee v. United States*,
  802 F.3d 1339 (Fed. Cir. 2015)...................................................21

*Albemarle Corp. v. United States*,
  821 F.3d 1345 (Fed. Cir. 2016).........................................8, 50, 51

*Boomerang Tube LLC v. United States*,
  856 F. 3d 908 (Fed. Cir. 2017)..................................................30

*Changzhou Hawd Flooring Co. v. United States*,
  848 F. 3d 1006 (Fed. Cir. 2017)............................................50, 51

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)...............................................................21

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966)...............................................................21

*Deacero S.A.P.I. de C.V. v. United States*,
  996 F.3d 1283 (Fed. Cir. 2021)............................................39, 45

*Diamond Sawblades Mfrs.' Coal v. United States*,
  415 F. Supp. 3d 1365 (Ct. Int'l Trade 2019)................................46

*Essar Steel, Ltd. v. United States*,
  753 F.3d 1368 (Fed. Cir. 2014)..................................................45

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
  216 F.3d 1027 (Fed. Cir. 2000)............................................45, 46

*Filippo Fara S. Martino S.p.A. v. United States*,
  216 F.3d 1027 (Fed. Cir. 2000)..................................................45

*Fujitsu General Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996)...................................................21

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*,
  25 C.I.T. 1150 (2001)....................................................................35

*GODACO Seafood Joint Stock Co. v. United States*,
  435 F. Supp. 3d 1342 (Ct. Int'l Trade 2020)................................35

*Hubbell Power Sys. v. United States*,
  No. 15-00312, 2019 WL 6174713 (Ct. Int'l Trade Nov. 20, 2019)..................48

*Hyundai Elec. & Energy Sys. Co. v. United States*,
  15 F.4th 1078 (Fed. Cir. 2021)......................................................26

*Jinan Yipin Corp. v. United States*,
  800 F. Supp. 2d 1226 (Ct. Int'l Trade 2011)................................24

*Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States*,
  23 C.I.T. 826 (1999)....................................................................35

*Mukand, Ltd. v. United States*,
  767 F.3d 1300 (Fed. Cir. 2014)...................................... 32, 35, 37

*Mukand, Ltd. v. United States*,
  No. 11-00401, 2013 WL 1339399 (Ct. Int'l Trade Mar. 25, 2013) ................22

*Nan Ya Plastics Corp. v. United States*,
  810 F.3d 1333 (Fed. Cir. 2016)..............................................42, 44

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003)........................................... passim

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006)......................................................21

*NSK Ltd. v. United States*,
  481 F. 3d 1355 (Fed. Cir. 2007).....................................................46

*NTN Bearing Corp. v. United States*,
  74 F.3d 1204 (Fed. Cir. 1995).......................................................30

iv

*PAM, S.p.A. v. United States,*
    582 F.3d 1336 (Fed. Cir. 2009)...................................................................42

*Papierfabrik August Koehler AG v. United States,*
    843 F.3d 1373 (Fed. Cir. 2016)..................................................... 42, 44, 45

*PrimeSource Bldg. Prods. v. United States,*
    581 F. Supp. 3d 1331 (Ct. Int'l Trade 2022)................................................54

*Pro-Team Coil Nail Enterprise, Inc. v. United States,*
    419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019).................................................2

*Pro-Team Coil Nail Enterprise, Inc. v. United States,*
    483 F. Supp. 3d 1242 (Ct. Int'l Trade 2020).................................................2

*Pro-Team Coil Nail Enterprise, Inc. v. United States,*
    532 F. Supp. 3d 1281 (Ct. Int'l Trade 2021).................................................2

*Pro-Team Coil Nail Enterprise, Inc. v. United States,*
    587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022).................................................2

*PSC VSMPO-AVISMA Corp. v. United States,*
    498 Fed. Appx. 995 (Fed. Cir. 2013)..........................................................42

*Reiner Brach GmbH & Co. KG v. United States,*
    206 F. Supp. 2d 1323 (Ct. Int'l Trade 2002)...............................................32

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017)...............................................54

*Ta Chen Stainless Steel Pipe, Inc. v. United States,*
    298 F.3d 1330 (Fed. Cir. 2002)..........................................................41, 44

*Tung Mung Dev. Co. v. United States,*
    25 C.I.T. 752 (2001).......................................................................23, 32

*Union Steel v. United States,*
    713 F.3d 1101 (Fed. Cir. 2013)................................................................21

v

*Viet I-Mei Frozen Foods Co. v. United States*,
 839 F. 3d 1099 (Fed. Cir. 2016)............................................................46, 47

## UNITED STATES CODE

19 U.S.C. 1516a(b)(1)(B)(i) ...........................................................................21

19 U.S.C. § 1673 ...............................................................................................3

19 U.S.C. § 1673d(a)(1)....................................................................................4

19 U.S.C. § 1673d(b)(1) ...................................................................................4

19 U.S.C. § 1673d(c)(2)....................................................................................4

19 U.S.C § 1673d(c)(5) .....................................................................................8

19 U.S.C. § 1673d(c)(5)(A)..............................................................................8

19 U.S.C. § 1673d(c)(5)(B) .........................................................................8, 49

19 U.S.C. § 1675 ...............................................................................................4

19 U.S.C. § 1675(a)(2)(A) ................................................................................3

19 U.S.C. § 1675(a)(2)(C)................................................................................3

19 U.S.C. § 1677b(a)..........................................................................................3

19 U.S.C. § 1677b(b) .........................................................................................3

19 U.S.C. § 1677e.....................................................................................5, 8, 29

19 U.S.C. § 1677e(a)...................................................................................13, 53

19 U.S.C. § 1677e(a)(1)...................................................................................22

19 U.S.C. § 1677e(a)(2)(A)-(D).......................................................................6

19 U.S.C. § 1677e(b)...................................................................... 7, 38

19 U.S.C. § 1677e(b)(1)(A)............................................................... 6

19 U.S.C. § 1677e(b)(2)..................................................................39

19 U.S.C. § 1677e(c).......................................................................39

19 U.S.C. § 1677e(c)(1).............................................................15, 39

19 U.S.C. § 1677e(d).......................................................................11

19 U.S.C. § 1677e(d)(3)..............................................................39, 43

19 U.S.C. § 1677f-1(c)(2)............................................................ 5, 50

19 U.S.C. § 1677f-1(c)(2)(B)............................................................5

19 U.S.C. § 1677m(C)......................................................................6

19 U.S.C. § 1677m(c)(1)...................................................................6

19 U.S.C. § 1677m(D).....................................................................6

19 U.S.C. § 1677m(d)................................................................23, 32

19 U.S.C. § 1677m(e)............................................................... passim

19 U.S.C. § 1677m(i).......................................................................6

19 U.S.C. § 3512(d).........................................................................7

## **<u>REGULATIONS</u>**

19 C.F.R. § 351.204(d)....................................................................4

19 C.F.R. § 351.205(a).....................................................................4

19 C.F.R. § 351.207 ..................................................................4

19 C.F.R. § 351.210(a) ..............................................................4

19 C.F.R. § 351.213 ..................................................................4

19 C.F.R. § 351.308(c) ..............................................................7

## FEDERAL REGISTER NOTICES

*Prestressed Concrete Steel Wire Strand From Mexico,*
   68 Fed. Reg. 68,350 (Dep't of Commerce Dec. 8, 2003) ...............26

*Lined Paper Product From India,*
   71 Fed. Reg. 45,012 (Dep't of Commerce Aug. 8, 2006) ..............25

*Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman,*
*Taiwan, and the Socialist Republic of Vietnam,*
   80 Fed. Reg. 39,994 (Dep't of Commerce July 13, 2015) .............9

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
   81 Fed. Reg. 62,720 (Dep't of Commerce Sept. 12, 2016) ............9

*Finished Carbon Steel Flanges from Italy,*
   82 Fed. Reg. 29,481 (Dep't of Commerce June 29, 2017) ...........22

*Certain Steel Nails from Taiwan,*
   82 Fed. Reg. 36,744 (Dep't of Commerce Aug. 7, 2017) .........11, 12

*Certain Steel Nails From Taiwan,*
   83 Fed. Reg. 6,163 (Dep't of Commerce Feb. 13, 2018) ................2

*Polyester Textured Yarn from India,*
   84 Fed. Reg. 63,843 (Dep't of Commerce Nov. 19, 2019) ...........39

*Prestressed Concrete Steel Wire Strand from Indonesia,*
   86 Fed. Reg. 18,495 (Dep't of Commerce Apr. 9, 2021) .............39

*Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China*,
  86 Fed. Reg. 27,379 (Dep't of Commerce May 20, 2021).............................40

## <u>LEGISLATIVE HISTORY</u>

Statement of Administrative Action,
  H.R. Rep. No. 103-31, *as reprinted in* 1994 U.S.C.C.A.N. 4040.. 7, 9, 39, 43, 50

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, counsel for defendant-appellee states that she is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title.

Counsel for defendant-appellee is aware of two cases pending that may affect or be affected by the Court's decision in this appeal: *Mid Continent Steel & Wire, Inc. v. United States*, Consol. No. 15-00213 (Ct. Int'l Trade), and *PrimeSource Building Products, Inc. v. United States*, No. 22-2128 & 22-2129 (Fed. Cir.)

## CONFIDENTIAL MATERIAL OMITTED

The material on page 27 describes actions a respondent might take. The material on page 28 describes a percentage. The material on page 29 describes a percentage. The material on page 40 describes characterizations of transaction-specific margins. The material on page 41 describes a number of transaction-specific margins and a characterization of those margins. The material on page 43 describes quantities of various margins, as well as characterizations of those margins. The material on pages 43 and 44 describe characterizations of normal

values compared to each other.  The material on page 53 describes types of nails

subject to the antidumping duty order.

No. 2022-2241

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

PRO-TEAM COIL NAIL ENTERPRISE, INC., PT ENTERPRISE INC.,
PRIMESOURCE BUILDING PRODUCTS, INC., S.T.O. INDUSTRIES, INC.,
Plaintiffs,

UNICATCH INDUSTRIAL CO., LTD., TC INTERNATIONAL, INC., HOR
LIANG INDUSTRIAL CORPORATION, ROMP COIL NAIL INDUSTRIES,
INC.,
Plaintiffs-Appellants,

v.

UNITED STATES, MID CONTINENT STEEL & WIRE, INC.,
Defendants-Appellees.

_____

Appeal from the United States Court of International Trade in
Case No. 18-cv-00027, Chief Judge Mark A. Barnett.

_____

## STATEMENT OF THE ISSUES

1.     Whether the Department of Commerce's (Commerce) determination

that Unicatch Industrial Co., Ltd. and TC International, Inc. (collectively,

Unicatch) failed to provide a complete cost reconciliation, thereby warranting the

application of facts available with an adverse inference (AFA), is supported by

substantial evidence and otherwise in accordance with law.

2.     Whether Commerce's selection of a 78.17 rate for the AFA rate was

lawful and supported by substantial evidence.

3.    Whether Commerce's use of the expected method to calculate the rate for non-selected respondents was lawful and supported by substantial record evidence.

## STATEMENT OF THE CASE

I.    Nature Of The Case

This appeal concerns the final results of the first administrative review of the antidumping duty order covering certain steel nails from Taiwan. *See Certain Steel Nails From Taiwan,* 83 Fed. Reg. 6,163 (Dep't of Commerce Feb. 13, 2018) (final results), and accompanying Issues and Decision Memorandum (IDM), Appx1-32. Plaintiffs-Appellants Unicatch and Hor Liang Industrial Corporation and Romp Coil Nails Industries (collectively, HL/Romp) appeal from the final judgment of the United States Court of International Trade (trial court) in *Pro-Team Coil Enterprise Inc. v. United States*, Consol. Ct. No. 18-00027 (Ct. Int'l Trade). Appx361. The trial court's various decisions under review are as follows: *Pro-Team Coil Nail Enterprise, Inc. v. United States*, 419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) (*Pro-Team I*), Appx33-70; *Pro-Team Coil Nail Enterprise, Inc. v. United States*, 483 F. Supp. 3d 1242 (Ct. Int'l Trade 2020) (*Pro-Team II*), Appx105-124; *Pro-Team Coil Nail Enterprise, Inc. v. United States*, 532 F. Supp. 3d 1281 (Ct. Int'l Trade 2021) (*Pro-Team III*), Appx296-317; *Pro-Team Coil Nail*

*Enterprise, Inc. v. United States*, 587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) (*Pro-Team IV*), Appx341-360.

II.    Legal Framework For Calculation Of Antidumping Duties

    A.    Commerce's Issuance of The Antidumping Duty Order

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade practices. If Commerce "determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than fair value," it will impose an antidumping duty on the merchandise in the amount that "the normal value exceeds the export price." 19 U.S.C. § 1673. Thus, in an antidumping proceeding, Commerce determines whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price (the price of the goods sold in the United States) and the "normal value" of the merchandise. *See* 19 U.S.C. §§ 1673, 1675(a)(2)(A), (C), 1677b(a).

To ensure that normal value is an appropriate benchmark against which to measure whether sales in the United States are dumped, Commerce tests the normal value sales to determine if they are made below cost. *See* 19 U.S.C. § 1677b(b). Commerce calculates a respondent-specific per unit cost of production of the merchandise and compares it to the normal value sales to ensure they are made above cost. Using the normal value sales that are made above cost, if

Commerce finds that a foreign producer or importer is selling its goods for less than these normal value sales, it makes an affirmative determination of dumping.

If Commerce makes a final determination that "the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value," and if the International Trade Commission makes a final determination that a United States industry has suffered injury or is threatened with material injury, Commerce issues an antidumping duty order. 19 U.S.C. § 1673d(a)(1), (b)(1), (c)(2); *see also* 19 C.F.R. § 351.207; 19 C.F.R. §§ 351.205(a), 351.210(a). Such an order makes the merchandise subject to a duty in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price).

B.    Statutory And Regulatory Scheme For Conducting Administrative Reviews

Respondents and petitioners[1] may request an annual administrative review of entries in which Commerce again determines the United States price and normal value for respondents subject to the review. This enables respondents and petitioners to have the dumping margins and assessment rates updated to reflect the trading activity during the review period. *See* 19 U.S.C. § 1675. The

---

[1]    Commerce refers to foreign producers or exporters in an antidumping proceeding as "respondents," and domestic manufacturers of the domestic like product who file petitions for relief as "petitioners." *See*, *e.g.*, 19 C.F.R. § 351.204(d); 19 C.F.R. § 351.213.

administrative review statute establishes deadlines for Commerce to issue preliminary and final results of its review.  *Id*.

Commerce has broad authority to limit the number of respondents in an administrative review where it is not practicable to examine all known producers and/or exporters of the subject merchandise.  Commerce may examine either: (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available at the time of selection, or (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can reasonably be examined.  19 U.S.C. § 1677f-1(c)(2).  Commerce's most common practice is to limit examined respondents by selecting the exporters and producers accounting for the largest volume.  *See* 19 U.S.C. § 1677f-1(c)(2)(B).  These individually examined companies are commonly referred to as mandatory respondents.

To conduct a dumping analysis for the mandatory respondents, Commerce must obtain from respondents the information necessary to determine the United States prices and the normal value information.  Commerce does this by issuing an extensive initial questionnaire and supplemental questionnaires, as necessary.

C.    Legal Framework For Application Of Facts Available And An Adverse Inference

Pursuant to 19 U.S.C. § 1677e, Commerce must follow a two-step process to apply facts available with an adverse inference.  First, Commerce uses facts

otherwise available to fill gaps in the record if an interested party: "(A) withholds information that has been requested by {Commerce}; (B) fails to provide such information by the deadlines for submission in the form and manner requested {subject to 19 U.S.C. 1677m(c)(1) and (e)}; and (C) significantly impedes a proceeding . . . ; or (D) provides such information but the information cannot be verified as provided for in {1677m(i)}." 19 U.S.C. § 1677e(a)(2)(A)-(D).

Subsequent to making a determination that it should rely on facts otherwise available, Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available," *i.e.,* an adverse inference, if an interested party fails to cooperate to the best of its ability. 19 U.S.C. § 1677e(b)(1)(A). An interested party fails to cooperate to "the best of its ability" when it fails to "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries{.}" *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.* Notably, while the "best of its ability" standard does not require perfection, it does require a respondent's "familiarity with all of the records it maintains," and that respondents "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers'

6

ability to do so." *Id*. "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Id*. at 1383.

The Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act explains that the purpose of the adverse facts available provision is "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[2]  SAA, H.R. Rep. No. 103-316, at 870 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4199.  When applying an adverse inference, Commerce also considers the extent to which a party may benefit from its own lack of cooperation. *See Nippon Steel*, 337 F.3d at 1382-83.

In selecting an adverse rate, Commerce may rely on information from: (1) the petition, (2) the final determination in the investigation, (3) any previous administrative review, or (4) any other information placed on the record. *See* 19 U.S.C. § 1677e(b); 19 C.F.R. § 351.308(c).  When selecting from among the possible sources, Commerce seeks to use a rate that is sufficiently adverse to

---

[2]  *See* 19 U.S.C. § 3512(d) ("{The SAA is} an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and {the Tariff Act of 1930, as amended,} in any judicial proceeding in which a question arises concerning such interpretation or application.").

effectuate the statutory purpose of inducing respondents to provide Commerce with complete and accurate information in a timely manner.

D. Calculation Of A Rate For Companies Not Individually Examined

Because the governing statute does not address a method for calculating the rate to be assigned to non-individually examined respondents in an administrative review, Commerce's practice is to follow the methodology set forth in 19 U.S.C § 1673d(c)(5), which provides instructions for calculating the all-others rate in investigations. *See Albemarle Corp. v. United States*, 821 F.3d 1345, 1351-53 (Fed. Cir. 2016).

Pursuant to subsection 1673d(c)(5)(A), Commerce calculates the all-others rate by weight-averaging the dumping margins assigned to the mandatory respondents, excluding any margins that are zero, *de minimis*, or determined entirely under 19 U.S.C. § 1677e (*i.e.*, on the basis of facts available). *See* 19 U.S.C. § 1673d(c)(5)(A). If, however, all the dumping margins for the individually examined respondents are zero, *de minimis*, or determined based entirely on the basis of facts available, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B).

8

The SAA provides that, when the dumping margins for all mandatory respondents are zero, *de minimis*, or determined entirely on the basis of facts available, "{t}he expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available," unless it "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers{.}" SAA at 873.

III.    Statement Of Facts And Course Of Proceedings Below

A.    Initial Administrative Proceedings Before Commerce

On July 13, 2015, Commerce issued an antidumping order covering certain steel nails from Taiwan. *See Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed. Reg. 39,994 (Dep't of Commerce July 13, 2015). On September 12, 2016, Commerce initiated the first administrative review of the order, covering the period from May 20, 2015, through June 30, 2016. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 62,720 (Dep't of Commerce Sept. 12, 2016) (initiation notice), Appx396, Appx400-401. Based on U.S. Customs and Border Protection (CBP) data, Commerce selected the two companies accounting for the largest volume of subject merchandise during the

9

period of review: PT Enterprise Inc.[3] (Pro-Team) and Bonuts Logistics Co., LLC (Bonuts), as mandatory respondents and issued antidumping questionnaires to them. Appx475-484, Appx485, Appx650.

On December 1, 2016, Unicatch filed a request for voluntary respondent treatment. Appx815-816. After receiving a letter from Bonuts in which it indicated that it would not participate in the administrative review, Commerce selected Unicatch, the company accounting for the next largest volume of merchandise, as an additional mandatory respondent. Appx827-828, Appx3262-3265.

Commerce requires mandatory respondents to submit a complete reconciliation of cost of sales data to the antidumping cost database; consistent with its practice, Commerce requested that Unicatch do so. Appx16. Because Unicatch's initial questionnaire response contained numerical discrepancies between the total cost as reflected in audited financial statements and the total cost reflected in the cost database, Commerce issued a supplemental questionnaire to Unicatch. Appx3305-3314. In it, Commerce specifically requested that Unicatch revise its cost calculation, and noted that the cost reconciliation did not reconcile Unicatch's sales from its audited financial statements to the extended total cost of manufacturing. Appx3313. After granting three extension requests totaling 20

---

[3] During the course of the review, Commerce collapsed Pro-Team Coil Nail Enterprise Inc. and PT Enterprise Inc (collectively, Pro-Team). Appx5908.

days, Commerce received Unicatch's first supplemental response.  Appx3315-3316, Appx3906, Appx3907-4273.

Commerce then issued a second supplemental questionnaire, repeating its request for a revised cost reconciliation and requesting further explanation and support for each reconciling item.  Appx4330-4335.  Unicatch provided its second supplemental response on June 7, 2017.  Appx4901-5430.

On August 1, 2017, Commerce issued its preliminary results.  *See Certain Steel Nails from Taiwan*, 82 Fed. Reg. 36,744 (Dep't of Commerce Aug. 7, 2017) (preliminary results), Appx5936-5938, and Preliminary Issues and Decision Memorandum (Aug. 1, 2017) (PDM), Appx5903-5923.  In the preliminary results, Commerce applied facts otherwise available with an adverse inference to Pro-Team.  Appx5911-5912.  Thus, pursuant to 19 U.S.C. § 1677e(d), Commerce preliminarily relied on the petition rate assigned in the less-than-fair-value investigation, 78.17 percent, as the AFA rate for Pro-Team.  Appx5912-5914.  Commerce also applied AFA to Bonuts, as it had created informational gaps in the record when it chose to not provide questionnaire responses and clearly failed to cooperate to the best of its ability; Commerce also used the 78.17 percent rate for Bonuts.  Appx5913-5914.

With regard to Unicatch, Commerce preliminarily relied on facts otherwise available in its constructed value calculations and determined a weighted-average

11

dumping margin of 34.20 percent. Appx5921; *see also Preliminary Results*, 82 Fed. Reg. 36,744. Commerce preliminarily assigned the non-selected respondents, including HL/Romp, a margin of 34.20 percent, the margin assigned to Unicatch. *See* 82 Fed. Reg. 36,744.

In its final results, Commerce continued to apply AFA to Pro-Team. Appx13-15. Commerce also continued to apply AFA to Bonuts. Appx5. For Unicatch, however, Commerce reconsidered the record evidence in light of the parties' comments and case briefs, and determined that, despite multiple requests for information, Unicatch had not fully provided the requested information concerning its cost of producing merchandise. Appx16. Specifically, Commerce determined that Unicatch had not submitted a complete cost reconciliation of costs of sales to the antidumping cost database. *Id*. Commerce found that there was a gap in Unicatch's cost reconciliation and that there were "reconciling items" within Unicatch's supplemental response lacking explanation and detail, despite Commerce's having specifically requested that information for all reconciling items. Appx17. Accordingly, Commerce concluded that necessary information was not available on the record for it to analyze Unicatch's section D questionnaire cost response and calculate a reliable margin. Appx16.

Commerce explained that, without the complete cost reconciliation, it was not possible to establish whether all costs were properly included or excluded.

Appx17.  Despite Unicatch's having multiple opportunities to remedy or explain the deficiencies, Commerce found that Unicatch did not provide reliable cost of production information allowing Commerce to calculate a reliable antidumping margin for Unicatch pursuant to 19 U.S.C. § 1677m(e), and that it was necessary to rely on total facts otherwise available pursuant to 19 U.S.C. § 1677e(a).  Appx17; *see also* Appx61 (detailing Commerce's practice of rejecting all of a respondent's submitted information when flawed and unreliable cost data renders comparison impossible).

Commerce further determined that Unicatch did not cooperate to the best of its ability and that application of an adverse inference was warranted because Unicatch:  (1) did not submit a complete cost reconciliation, (2) did not account for the difference between the total costs of manufacturing derived from the cost database and the total costs of nails shown in the cost reconciliation, and (3) did not alert Commerce that it would have any difficulty in providing complete response.  Appx20.  Commerce assigned Unicatch a 78.17 percent rate, which reflected the highest dumping margin alleged in the petition.  Appx21-22.  Consequently, Commerce adjusted the dumping margin for non-examined companies, including HL/Romp, to 78.17 percent, the same margin determined for all three mandatory respondents.  *See Final Results*, 83 Fed. Reg. at 6,164.

B.     First Remand Opinion And Remand Results

On December 19, 2019, the trial court issued an opinion. Appx33-70. The court remanded Commerce's application of AFA to Pro-Team for reconsideration. With regard to Unicatch, the court first sustained Commerce's reliance on facts available, holding that even Unicatch did not dispute that it had failed to complete the requested cost reconciliation. Appx62. The court found Unicatch's arguments unpersuasive because Commerce had repeatedly requested information, and Unicatch had not demonstrated a misunderstanding of the requests. Appx63-64. The court also cited Commerce's attempt to complete the reconciliation itself and explained that it was Unicatch's responsibility to build a clear record. Appx65. The court sustained the use of total facts available because "partial, rather than total, facts available would permit respondents to manipulate the process by submitting only beneficial information and would place ultimate control to determine what information would be used for the margin calculation in the hands of respondents rather than Commerce." Appx67 (quotations omitted).

While sustaining the use of facts available, the trial court held that Commerce's application of an adverse inference to Unicatch was not supported by substantial evidence because Commerce had "failed to account for evidence demonstrating Unicatch's attempts to comply with Commerce's supplemental questionnaire or apprise the court of its reasons for nevertheless finding less than

14

full cooperation." Appx68.  Accordingly, the court remanded to Commerce to explain its application of an adverse inference to Unicatch.  *Id.*

In its first remand results, Commerce reevaluated application of total AFA to Pro-Team and used record information to calculate a *de minimis* margin for Pro-Team instead.  Appx78-80.  Commerce continued to apply an adverse inference to Unicatch, explaining why it reasonably expected Unicatch to be more forthcoming and provide the requested information after three questionnaires.  Appx82-85. Commerce then recalculated the non-selected respondents' rate (the all-others rate) to reflect the average of Pro-Team's and Unicatch's rates.  Appx87-88.

C.     Second Remand Opinion And Remand Results

In its second remand order, the trial court sustained Commerce's decision to continue to apply total AFA to Unicatch.  Appx105-124.  The court agreed that, while perfection is not required, Commerce reasonably expected more from Unicatch, given its three detailed requests for a complete cost reconciliation. Appx114.  The court also stated that the information sought by Commerce was fundamental to its analysis, and that Commerce could use an adverse inference to incentivize Unicatch to cooperate more fully in the future.  Appx116.  The court, however, remanded Commerce's selection of 78.17 percent—a rate derived from the petition—as the AFA rate, holding that Commerce had not adequately corroborated the rate in accordance with 19 U.S.C. § 1677e(c)(1).  Appx117-122.

15

In its second remand results, Commerce corroborated the use of the 78.17 percent petition margin as the basis for the adverse rate assigned to Unicatch, relying on two separate, but both reasonable, methods that Commerce has employed in the past: the transaction-specific approach and the component approach. Appx125-152. For the transaction-specific approach, Commerce identified certain transaction-specific margins from Pro-Team and compared them to the petition rate of 78.17 percent. Appx132. For the component approach, Commerce determined that it could corroborate the petition rate by comparing the normal value and net U.S. price underlying that margin to the normal value and net U.S. prices calculated for Pro-Team. Appx132-133.

Commerce also addressed Unicatch's arguments that the 78.17 percent rate was unduly punitive and did not consider the totality of the circumstances. Appx133-134, Appx142-143. Commerce explained the importance of the AFA mechanism, and how Unicatch's lack of cooperation had impeded Commerce's administrative review. Appx134. Commerce also reiterated that the AFA rate was not aberrational, and that it was not required to determine what the rate would have been had Unicatch cooperated or that the selected rate reflects Unicatch's alleged commercial reality. Appx134-135.

Because it had inadvertently failed to include the rate for mandatory respondent Bonuts when calculating the all-others rate in the first remand results,

16

Commerce recalculated the all-others rate as well. Appx135-136. Commerce used a simple average of the margins for Pro-Team, Unicatch, and Bonuts. *Id.* In doing so, it explained that it had used a simple average of the dumping margins for the individually examined companies rather than a weighted-average margin because it did not have the sales values from Bonuts necessary to use a weighted-average margin. Appx149-150.

      D.    Third Remand Order And Remand Results

      In its third remand order, Appx296-317, the trial court affirmed Commerce's selection and corroboration of the 78.17 percent AFA rate applied to Unicatch. Appx304-309. The court rejected Unicatch's argument that the transactions Commerce identified represented too small a portion of Pro-Team's total transactions, quantity, and sales value, explaining that the statute and Commerce's practice do not require the corroborating transactions to represent a certain number, and that even a single sale may suffice for purposes of corroboration. Appx304, Appx306. The court also held that the transaction-specific margins Commerce relied on were not aberrational. Appx307. Finally, the court held that the rate was not punitive but rather appropriate to incentivize future compliance. Appx308-310.

      The trial court, while allowing Commerce to correct its error and include Bonuts's margin in calculating the all-others rate, held that Commerce had

17

departed from the expected method for calculating that rate without explaining why it could not rely on certain CBP import volume data for Bonuts that was on the record to calculate the margin using a weighted average. Appx313-316. The court remanded for Commerce to reconsider its method or further explain its departure from the expected method. Appx315.

In its third remand results, Commerce determined it could rely on the CBP volume data and determined to use the expected method to calculate the all-others rate by weight-averaging the rates of the three mandatory respondents. Appx318-340. Commerce calculated an all-others rate of 35.30 percent. Appx336.

### E.     Fourth Trial Court Opinion

The trial court sustained Commerce's reliance on the CBP data and use of the expected method to calculate the rate for non-selected respondents. Appx341-360. The court explained that the relevant statute, SAA, and this Court's case law demonstrate that mandatory respondents are assumed representative of the non-selected respondents and stated that the burden of proof lies with the party seeking to depart from the expected method. Appx349-354. The court agreed with Commerce that substantial record evidence did not support a finding that the mandatory respondents' rates were not representative because the history of the rates showed fluctuations from review to review, and pointed out that HL/Romp ignored the AFA rates that had been assigned to mandatory respondents.

18

Appx356. The court also held that Commerce's decision to include Bonuts's rate in the calculation was lawful because, absent Bonuts's cooperation, Commerce could not verify Bonuts's claim that it believed it was not representative of other Taiwan nails producers. Appx358.

## SUMMARY OF THE ARGUMENT

The trial court's judgment should be affirmed. Commerce's decision to apply facts available with an adverse inference in determining a dumping rate for Unicatch was supported by substantial evidence and in accordance with law. Despite Commerce's having asked Unicatch three times for a fully reconciled antidumping cost database, Unicatch still failed to provide a complete cost reconciliation. Furthermore, record evidence demonstrates that Unicatch's reconciliation did not properly link to the antidumping cost database. Commerce thus correctly determined that necessary information for Unicatch was not available on the record, that Unicatch did not provide information in the form and manner requested, and that Unicatch had significantly impeded the proceeding. Commerce also appropriately determined that Unicatch did not cooperate to the best of its ability, explaining that it reasonably expected more from Unicatch and that Unicatch could have benefited itself by its behavior.

Commerce's selection of 78.17 percent as the AFA rate was also lawful and supported by substantial evidence. The statutory framework explicitly allows

19

Commerce to select a rate from the underlying petition, and the rate need not reflect Unicatch's economic reality or the margin that would have applied if Unicatch had cooperated. Commerce corroborated the rate using two separate, established methods: the transaction-specific approach and the component approach. Although corroboration using only one of these methods would have been sufficient, Commerce found that both methods corroborated the petition rate. Moreover, Unicatch cannot demonstrate that the corroborated rate was punitive or aberrational.

Finally, Commerce's use of the expected method in calculating a rate for non-selected respondents was lawful and supported by substantial evidence. Commerce complied with the default method for calculating the all-others rate, and no record evidence demonstrates that the expected method is not reasonably reflective of non-selected respondents' dumping margins. Commerce also properly declined to exclude Bonuts's rate from the all-others rate, because Commerce could not verify Bonuts's alleged non-representativeness due to its refusal to cooperate.

## **ARGUMENT**

I.     Standard Of Review

In reviewing the trial court's judgments, this Court "reappl{ies} the statutory standard of review that the Court of International Trade applied in reviewing the

20

administrative record." *Nippon Steel*, 337 F.3d at 1379 (2003). Accordingly, this Court will uphold Commerce's determination unless it is unsupported by substantial record evidence, or otherwise unlawful. *See Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). Although precedent set by the trial court is not binding, this Court has declared that it "will not ignore the informed opinion of the {trial court}." *Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citation and quotation marks omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing two different conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Moreover, Commerce is accorded particular deference in antidumping and countervailing duty determinations. *See, e.g.*, *Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996). Accordingly, a party disputing Commerce's determination as unsupported by substantial evidence "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006).

II.     Commerce's Application Of Facts Available With An Adverse Inference To
        Unicatch Was Supported By Substantial Evidence

The trial court correctly sustained Commerce's application of facts

available, and, on remand, application of an adverse inference.

A.      Commerce Properly Applied Facts Available

Because Unicatch failed to submit a complete cost reconciliation, despite

multiple requests, Commerce properly found that Unicatch failed to timely provide

necessary information in the form and manner requested, withheld requested

information, and impeded the proceeding. Appx16; *see also* 19 U.S.C.

§ 1677e(a)(1). Furthermore, Commerce appropriately determined that necessary

cost information was not available on the record that was both reliable and able to

be used without undue difficulty. Appx16, Appx18. Of course, "cost information

is a vital part of {Commerce's} dumping analysis. *See, e.g., Finished Carbon*

*Steel Flanges from Italy*, 82 Fed. Reg. 29,481 (Dep't of Commerce June 29, 2017),

and accompanying IDM (citing *Mukand, Ltd. v. United States*, No. 11-00401, 2013

WL 1339399, at *1 (Ct. Int'l Trade Mar. 25, 2013)).

"On three occasions, Commerce instructed Unicatch to submit a complete

cost reconciliation that began with the cost of sales reflected in the company's

financial statements and ended with the reported per-unit costs submitted to the

agency." Appx62. And, as the trial court pointed out, Unicatch "does not dispute

Commerce's core finding that Unicatch failed to complete the requested cost

reconciliation." *Id.*

Appellants argue, as Unicatch did before the trial court, that Commerce should have provided Unicatch with an additional opportunity to remedy the reconciliation issues. *See, e.g.*, Appellant Br. at 29. But Commerce was not required to do so. If Commerce determines that a response does not comply with the request for information in an antidumping duty review, it shall "promptly inform the person submitting the response of the nature of the deficiency{.}" 19 U.S.C. § 1677m(d). If that party submits further information that continues to be unsatisfactory, or this information is not submitted within the applicable time limits, Commerce may, subject to 19 U.S.C. § 1677m(e), disregard all or part of the original and subsequent responses, as appropriate. Furthermore, Commerce is not obligated to permit the respondent to remedy a deficient response where the respondent has not met all five criteria set forth in 19 U.S.C. § 1677m(e). *See Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752, 789 (2001).

During the underlying administrative proceeding, Commerce identified discrepancies in Unicatch's cost reconciliation and issued multiple supplemental questionnaires specifically requesting that Unicatch provide a complete cost reconciliation, including explanations and documentary support for each reconciling item. Appx3313 (requesting that Unicatch revise its cost calculation); Appx4344 (requesting that Unicatch provide additional sales information). In

issuing the supplemental questionnaires, Commerce notified Unicatch of the deficiency in its information. Thus, in accordance with the statute, Commerce promptly notified Unicatch of the defective reconciliation and more than fulfilled its obligations by issuing not only one, but two supplemental questionnaires to allow Unicatch to provide the requested information; Commerce was not required to provide yet another opportunity. Appx64. Moreover, as noted by the trial court, "{a}t no time did {Unicatch} express a lack of understanding of the request or seek further guidance from Commerce on how to respond to the request." Appx63.

Appellants also claim that the record contained all the information necessary to complete Unicatch's cost reconciliation. Appellants Br. at 28-29, 33-34. But, as Commerce found, and the trial court agreed, that was not the case. It is axiomatic that the burden of creating an adequate record rests upon interested parties. *See Jinan Yipin Corp. v. United States*, 800 F. Supp. 2d 1226, 1305 (Ct. Int'l Trade 2011) (stating "{i}t is true that, as general principle, '{t}he burden of creating an adequate record lies with respondents and not with Commerce.'") (internal citations omitted). And the information respondents are required to provide includes the linkage among various data submitted by respondents to demonstrate that the data they submit fully reconciles. Appx17-18.

Commerce correctly determined that necessary information was missing because, without the cost reconciliation, Unicatch's response was too incomplete

24

to serve as a reliable basis for reaching a determination pursuant to 19 U.S.C. § 1677m(e).  Appx18.  Specifically, in considering record evidence and the parties' arguments, Commerce found that Unicatch's cost reconciliation included non-scope merchandise and dollar value differences of product categories that do not reconcile.  Appx19.  Based on this information, Commerce determined that it could not continue to rely on Unicatch's reported information.  Appx16-18.  Moreover, instead of properly reconciling costs, as required, Unicatch merely asserted that the cost of sales might be linked through its supplemental response at SSD-4 and Section D response at exhibit D-17.  Appx19.  Although Unicatch indicated that a reconciliation might be completed via a schedule with non-scope products, it failed to *actually provide* a reconciliation directly linking to the antidumping cost database.  *Id.*  Finally, as Commerce found, there were "reconciling items" within Unicatch's supplemental response at exhibit SSD-3 that lacked explanations and related details, despite Commerce having specifically requested explanations and details for all reconciling items.  Appx17.

A respondent's failure to provide a complete reconciliation creates a situation in which Commerce has no reliable cost of production information.  S*ee, e.g., Lined Paper Product From India*, 71 Fed. Reg. 45,012 (Dep't of Commerce Aug. 8, 2006) (final results) and accompanying IDM at cmt. 14 (stating that "without a reliable overall cost reconciliation, and a clear explanation of Navneet's

product cost calculation method in the normal course of business and reported costs prior to verification, the Department was unable to proceed with the verification and, as a result, Navneet's submitted information was unverifiable"). To address such circumstances, Commerce developed what is now a longstanding practice to reject flawed and unreliable information that precludes price-to-price comparisons. *See e.g., Prestressed Concrete Steel Wire Strand From Mexico*, 68 Fed. Reg. 68,350 (Dep't of Commerce Dec. 8, 2003) (final results) and accompanying IDM at cmt. 6 (explaining that Commerce's "practice has been to reject a respondent's submitted information in total when flawed and unreliable cost data renders any price-to-price comparison impossible"); *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1090-91 (Fed. Cir. 2021) (affirming Commerce's application of facts available with an adverse inference when a respondent did not cooperate to the best of its ability to provide cost reconciliation information). Commerce adhered to its practice here in not relying on Unicatch's reported information for the final results. Appx19. Consistent with its practice and existing law, Commerce instead determined to rely on facts otherwise available.

Relatedly, appellants contend that Commerce could have used Unicatch's information, and that Unicatch would have rectified the problem if Commerce had

26

advised it to do so.[4]  Appellants Br. at 32-33.  But, as already explained, Commerce was not required to give Unicatch a fourth bite at the apple.  Moreover, as Commerce stated in the final results, Unicatch's failures "{left} Commerce without the ability to establish the starting point[] for the reported costs."  Appx17.

As discussed above, Commerce found that Unicatch's cost reconciliation had failed to reconcile the total cost of manufacturing derived from the cost database to the total costs of sales shown on its financial statements.  Appx16.  Unicatch put on the record of this review the company-wide costs of certain items in the cost reconciliation.  Appx6310; App5378-5379.  However, in an industry such as nail manufacturing, it is not typical that a producer would  [action]  such items as inputs.  Thus, "based on the cost reconciliation information provided by Unicatch, it appears that Unicatch is

[action and description]

    Appx6310.  But, as a reconciling item, Unicatch excluded these costs from the reported period of review company-wide cost of manufacturing and reported

---

[4]  Appellants' argument that Commerce did not provide Unicatch a template, but has now added such a template for more recent proceedings, Appellants' Br. at 10, is irrelevant.  Whether Commerce has added a template for subsequent proceedings has no bearing on Commerce's requests, and Unicatch's failure to comply with those requests, in the underlying proceeding.  Commerce's request was clear, and Unicatch did not express a lack of understanding.  Appx63.  Moreover, as the trial court stated, the template was not part of the administrative record and should not be afforded further consideration. *Id*.

cost database.  *Id.*  It failed to provide Commerce any explanations of, or details

relating to, these items, despite Commerce having specifically requested

explanations and details for all reconciling items, which amount to approximately

[number]percent of the cost of manufacturing.  *Id.*

While ignoring that its reconciliation did not reconcile these items,

appellants argue that Unicatch answered for the discrepancies in its reply brief.

Appellants Br. at 34-35.  They claim that, although the reconciliation included both

subject merchandise and non-subject merchandise, non-subject merchandise were

adequately identified by the acronym "NSM."  Appellants Br. at 35-36.  These

explanations only confirm that Unicatch did not actually provide a complete cost

reconciliation, as required by Commerce.  At the very most, the information cited

by Unicatch *might* have constituted a roadmap for Commerce to attempt to

reconcile Unicatch's data, but it was not the information required by Commerce in

the form and manner requested and did not assist Commerce in filling the gaps in

Unicatch's information.

In examining Unicatch's supplemental cost response, Commerce also found

other issues.  Commerce reviewed the difference between the total cost of

manufacturing in exhibit SSD-3 and the total extended cost of manufacturing in the

cost file, and found that the cost of manufacturing reported in the cost file included

control numbers (CONNUMs) which were sold during the period of review, but

not produced by Unicatch. Appx6309. Further, because these sold, but not produced, CONNUMs were assigned surrogate costs for purposes of computing the margin, they did not actually represent incurred costs during the period of review, and therefore should not have been included as part of the total reported cost of manufacturing amount in the cost file. Appx6309-6310. When the extended value of the sold but not produced merchandise CONNUMs was excluded from the cost file, a difference between the cost file and the reported cost reconciliation of [number]percent appears. Appx6310.

As explained in the final results, an incomplete reconciliation is not a full reconciliation of the type respondents are required to provide, and incompleteness in the starting point for the reported cost database results in a failure to establish the reliability of the reported costs. Appx18. Furthermore, without the ability to establish that all of the costs were properly included or excluded, the entire cost response was called into question and Commerce was left without the ability to use the per-unit costs in the cost database because no adjustment to remedy the deficiency could reasonably be identified. *Id*. Commerce properly considered the relevant factors and reasonably determined that the information Unicatch provided was too incomplete to serve as a reliable basis for reaching a determination pursuant to 19 U.S.C. § 1677e. *Id*.

Appellants allege that Commerce's calculation of a margin for Unicatch in

29

the preliminary results is an indicator that Unicatch had properly provided the information requested. Appellants Br. at 29, 34. But, as Commerce explained, the "preliminary results should not be interpreted as Commerce's confirmation that a respondent has provided complete responses, and the Preliminary Results in this case make no such claim as to the accuracy or completeness of Unicatch's submissions." Appx94. Commerce's use of a respondent's submitted information in the preliminary results of a proceeding does not guarantee that Commerce will continue to find it appropriate to use that information in the final results. *See, e.g., Boomerang Tube LLC v. United States*, 856 F. 3d 908, 912-13 (Fed. Cir. 2017); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("Preliminary determinations are 'preliminary' precisely because they are subject to change."). Finally, as Commerce explained, due to Unicatch's extension requests and the need for multiple supplemental responses, Commerce had little time to test and probe Unicatch's response prior to the preliminary results deadline and more fully consider Unicatch's deficiencies. Appx93.

Finally, to the extent appellants argue that Commerce could have assessed partial, rather than total, facts available, the trial court correctly held that judicial and agency precedent support Commerce's decision to use total facts available. Appx66. Importantly, as the court explained, "requiring Commerce to use partial, rather than total, facts available would permit respondents to manipulate the

30

process by submitting only beneficial information and would place ultimate control to determine what information would be used for the margin calculation in the hands of respondents rather than Commerce." Appx67 (quotations omitted). And, as explained above, Unicatch's unreliable information impaired Commerce's ability to conduct an accurate dumping analysis. Commerce's application of facts available was clearly warranted.

B.    Commerce Appropriately Applied An Adverse Inference

Commerce's application of an adverse inference was also reasonable, supported by the record, well-explained, and in accordance with law; Unicatch repeatedly failed to cooperate and did not act to the best of its ability in supplying requested information.

The trial court stated that an adverse inference may be drawn in circumstances where it is reasonable for Commerce to expect that more forthcoming responses should have been made, *i.e.*, "under circumstances in which it is reasonable to conclude that less than full cooperation has been shown." Appx67 (citation omitted). As Commerce explained on remand, "it was reasonable for Commerce to expect that Unicatch could provide the requested information after Commerce issued three separate supplemental questionnaires containing clear instructions on what information was necessary{.}" Appx83.

The record demonstrates that Unicatch failed to do the maximum it was able

31

to do in cooperating to the best of its ability. *See Nippon Steel*, 337 F.3d at 1382.

Unicatch submitted incomplete cost reconciliation information multiple times

despite Commerce's clear requests for information. Appx92-93. Commerce, in

analyzing Unicatch's actions, questioned "why Unicatch did not submit a complete

cost reconciliation and found no evidence that Unicatch was confused by

Commerce's instructions or that the instructions were unclear." Appx93; *see also*

Appx21, Appx84. While "Unicatch was given ample opportunity and time to

provide that information, . . . it simply did not put forth the effort or cooperation to

respond fully to Commerce's requests for a complete cost reconciliation."

Appx84.

    Where an agency's request is clear and relates to issues in an antidumping

proceeding, such as cost information, "{t}o avoid the risk of an adverse inference,

respondents must take reasonable steps to maintain full and complete records and

put forth maximum effort to investigate and obtain all requested information."

*Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306-07 (Fed. Cir. 2014) (citing

*Nippon Steel*, 337 F.3d at 1382); *see also Tung Mung*, 25 C.I.T. at 788-89 (2001)

("YUSCO had a statutory obligation to prepare an accurate and complete record in

response to questions plainly asked by Commerce."); *Reiner Brach GmbH & Co.*

*KG v. United States*, 206 F. Supp. 2d 1323, 1332-33 (Ct. Int'l Trade 2002)

(holding that Commerce complied with the requirements of 19 U.S.C. § 1677m(d)

because its initial questionnaire was clear as to the information requested, it questioned the respondent regarding discrepancies in supplemental questionnaire responses, and it was not obligated to request additional information where the respondent's response was "so vague that Commerce did not have notice or reason to believe a deficiency existed.").

Here, Commerce reasonably found that Unicatch did not put forth its maximum effort. As this Court has held, the adverse inference standard "does not condone inattentiveness {or} carelessness." *Nippon Steel*, 337 F.3d at 1382. And, as described above, Unicatch's responses are, at best, emblematic of both its inattentiveness and carelessness. For example, "Unicatch indicated how a reconciliation might be completed, demonstrating that it understood what information was being requested, yet it did not complete the reconciliation itself." Appx85. And, when Unicatch attempted to instruct Commerce on how to complete the cost reconciliation, via a schedule with non-scope products, it failed to directly link to the antidumping cost database. Appx84 (citing Appx19).

As Commerce concluded, "{b}ecause (1) Unicatch failed multiple times to provide a complete cost reconciliation despite Commerce's repeated instructions on how to do so, (2) Unicatch later told Commerce that Commerce could simply complete Unicatch's reconciliation on its own, and (3) Commerce found significant data discrepancies when attempting to complete the reconciliation, we

continue to find that Unicatch did not put forth its maximum effort to provide full

and complete answers with respect to its cost reconciliation." Appx85. These

stated reasons more than justify Commerce's application of an adverse inference.

Commerce also considered how Unicatch could potentially benefit from less

than full cooperation, explaining that:

> If Commerce is unable to conduct a cost comparison, then
> it is impossible to determine if dumping has occurred
> based on the submitted data. Thus, a respondent such as
> Unicatch can seek to limit the information on the record,
> significantly impeding Commerce's work and its ability to
> determine the presence of dumping, thus eliminating or
> greatly reducing the likelihood of a dumping margin. Any
> significant delay of a respondent in reporting requested
> information, or a refusal to provide requested information,
> can have the effect of benefitting that respondent because
> it allows less time for Commerce to fully and completely
> analyze the information and ask follow-up questions.

Appx86. Commerce considered the relevant factors, and made a reasoned,

supported decision to use an adverse inference, which the trial court correctly

sustained.

Appellants' arguments against Commerce's application of an adverse

inference lack merit. First, appellants argue that Unicatch's actions were not

egregious enough to for Commerce to apply facts available or adverse facts

available. Appellants Br. at 27. But appellants misunderstand the standard;

submitting false or misleading information is not the only situation in which

Commerce may find a respondent has not cooperated to the best of its ability, and

34

evidence of bad faith is not required. *See, e.g., Nippon Steel,* 337 F. 3d at 1382-83.

Nor is egregiousness the bar by which a determination to use an adverse inference

is measured; rather, anything less than maximum cooperation, including a failure

to put forth maximum effort to investigate and submit all requested information,

constitutes a sufficient basis for Commerce to apply an adverse inference. *See*

*Mukand*, 767 F.3d at 1306-07. "The statutory trigger for Commerce's

consideration of an adverse inference is simply a failure to cooperate to the best of

respondent's ability, regardless of motivation or intent." *Nippon Steel*, 337 F.3d at

1382-83; *see also GODACO Seafood Joint Stock Co. v. United States*, 435 F.

Supp. 3d 1342, 1350 (Ct. Int'l Trade 2020).

As they did before the trial court, appellants rely on *Mannesmannrohren-*

*Werke AG & Mannesmann Pipe & Steel Corp. v. United States*, 23 C.I.T. 826, 842

(1999), and *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 C.I.T.

1150, 1157 (2001). Appellants Br. at 25-26. But the trial court correctly

determined that reliance on those cases was misplaced. Appx115 ("In each case,

the court sustained Commerce's use of adverse facts available in the subsequent

redetermination that further explained why an adverse inference was merited in

connection with conduct not unlike the facts of this case.").

Appellants also claim that Unicatch reasonably believed that it complied

with Commerce's requirements and try to shift the blame to Commerce for not

advising Unicatch about its failure to complete the cost reconciliation. Appellants

Br. at 28, 30. But Commerce *did* advise Unicatch of its deficiencies, requesting

the information from Unicatch at least three times, and Unicatch still failed to

provide the requested information. Appx93-96 (citing Appx4344 and explaining

that "Commerce clearly stated what was lacking in Unicatch's responses and

provided adequate opportunities for Unicatch to revise its submitted data, such that

Commerce would be able to use it in calculating Unicatch's margin.").

Commerce did not apply an adverse inference from a single failure to

respond, but from multiple failures, and Commerce had no cause to believe that

Unicatch did not understand the requests, as demonstrated by Unicatch's lack of

request for clarification, its completion of other sections of the cost reconciliation,

and its attempted instructions for how Commerce might complete the

reconciliation on Unicatch's behalf. Appx83-84. Thus, Commerce reasonably

concluded that Unicatch's failure to submit the information did not demonstrate

maximum cooperation. Appx84, Appx96.

Appellants further argue that Unicatch could not have benefited from failing

to complete its cost reconciliation, Appellants Br. at 29-30, but Commerce

considered, and reasonably rejected, that point. Appx85-86, Appx94. Commerce

explained that Unicatch influenced the pace and schedule of Commerce's work to

its own advantage by submitting incomplete responses with ambiguous

information. Appx94. This resulted in Commerce considering incomplete data, within a shorter amount of time, for the preliminary results, which in turn resulted in a margin favorable to Unicatch. *Id.*; *see also Mukand*, 767 F.3d at 1307. The fact that Commerce, before having the opportunity to fully consider Unicatch's supplemental responses, preliminarily calculated a lower margin for Unicatch demonstrates the benefit to Unicatch in not fully cooperating.[5]

Appellants attempt to rebut Commerce's explanation by stating that the preliminary results have no legal significance. Appellants Br. at 34. But this argument is both inconsistent with its claim that the preliminary results showed that Commerce did not need to use facts available, and misses the point of Commerce's explanation on remand. If Commerce had stayed with its preliminary determination, the "preferable preliminary margin based on incomplete data" would have become the final margin and a deficient margin favorable to Unicatch. Appx94. However, that "preferable preliminary margin based on incomplete data" was a result of Unicatch's submitting incomplete and noncompliant information, to Unicatch's own advantage. *Id.*

---

[5] Commerce also pointed out that a non-cooperating respondent could seek to limit the information on the record, significantly impeding Commerce's ability to determine the presence of dumping, and that a delay or refusal to fully cooperate by a respondent allows less time for Commerce to fully and completely analyze the information. Appx86.

III.    Commerce's Selection And Corroboration Of The AFA Rate Was Lawful
        And Supported By Substantial Evidence

Commerce complied with statutory requirements in selecting its AFA rate of
78.17 percent, using a rate derived from the underlying petition and adequately
explaining its corroboration of that rate using two distinct methods.  Commerce
first corroborated the 78.17 percent petition margin by analyzing certain of
mandatory respondent Pro-Team's transaction-specific margins (the transaction-
specific approach), and then conducted an additional corroboration by comparing
the normal value and net U.S. price underlying the highest petition dumping
margin to the normal values and net U.S. prices calculated for Pro-Team (the
component approach).  Appx131-133.  Both approaches, standing alone, would
have been sufficient to corroborate the rate; taken together, they clearly
demonstrate the propriety of Commerce's decision to use the rate.  Moreover,
appellants cannot demonstrate that the rate was punitive or aberrational, such that it
must be overturned, and appellants' suggestion for the AFA rate would defeat the
purpose of AFA altogether.

A.    Relevant Legal Framework For Corroborating A Rate

Pursuant to 19 U.S.C. § 1677e(b), Commerce may use an inference adverse
to an interested party when an interested party fails to cooperate to the best of its
ability.  When relying on an adverse inference, Commerce may rely upon
information *from the petition*, the final determination from the investigation, a

38

previous administrative review, or any other record information on the record. 19 U.S.C. § 1677e(b)(2). As the trial court explained, information derived from the petition is considered secondary information pursuant to subsection 1677e(c). Appx117. And subsection 1677e(c)(1) requires that, when Commerce relies on secondary information, it must, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal. 19 U.S.C. § 1677e(c)(1).

The SAA provides that, in corroborating, Commerce should satisfy itself that the secondary information to be used has probative value. SAA at 870. Commerce will, to the extent practicable, evaluate the reliability and relevance of information to be used but, crucially, need not estimate what the dumping margin would have been if the non-cooperating party had cooperated fully or demonstrate that the dumping margin reflects an alleged commercial reality of the party. *See* 19 U.S.C. § 1677e(d)(3). Commerce may corroborate the highest petition margin using individual transaction-specific margins, or it may employ the component approach or other sources reasonably at its disposal. *See, e.g., Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1300 (Fed. Cir. 2021) (upholding Commerce's corroboration using the transaction-specific approach); *Polyester Textured Yarn from India*, 84 Fed. Reg. 63,843 (Dep't of Commerce Nov. 19, 2019), and accompanying IDM at cmt. 7 (Yarn from India IDM); *Prestressed*

*Concrete Steel Wire Strand from Indonesia*, 86 Fed. Reg. 18,495 (Dep't of Commerce Apr. 9, 2021), and accompanying IDM at 10; *see Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China*, 86 Fed. Reg. 27,379 (Dep't of Commerce May 20, 2021), and accompanying IDM at cmt. 1 (all employing the component approach).

B.    Commerce Corroborated The 78.17 Percent Petition Rate

As stated above, Commerce corroborated the 78.17 percent petition margin both by using transaction-specific margins and by examining the individual components—the normal value and net U.S. prices. Appx131-133. This corroboration was in accordance with Commerce's established practices and the law.

Commerce first employed the more frequently-used transaction-specific approach, identifying transaction-specific margins from Pro-Team, a mandatory respondent from the same review period, that were significantly [characterization] that the petition rate. Appx131-132. Because these transaction-specific rates were from a mandatory respondent examined in the same review period, and were [characterization]  the 78.17 petition rate, Commerce deemed them probative and, thus, sufficiently corroborative. *Id*.; *see also* Appx121. The trial court agreed, noting that "the petition rate fell [characterization] the transaction-specific margins" Commerce looked at. Appx306.

40

Appellants complain that there are only [number] transaction-specific margins [characterization] the 78.71 percent petition margin, and that those margins are aberrational outliers and do not represent the entirety of Pro-Team's transactions or sales. Appellants Br. at 38-39.   But appellants have not demonstrated that these transaction-specific margins are aberrational (indeed, their only argument is that they are [characterization] Pro-Team's other margins) or that the number of margins Commerce relied on falls below some non-articulated threshold.  Appellants cite a number of cases that purportedly support their arguments, but those cases do not impose a minimum number of transactions upon which Commerce may rely in corroborating.  Appellants Br. at 39-40.  Indeed, as the trial court explained, even a single sale may suffice for the purposes of corroboration.  Appx306 (citing *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002)). Not the statute, the relevant case law, nor Commerce's practice imposes a requirement that the corroborating transactions represent a minimum number or certain percentage of total sales.  Appx141.  Commerce's evaluation of whether certain transaction-specific margins are aberrational or non-probative should not be so limited. *Id.*

As Commerce determined, there is no evidence that the transactions examined were somehow unique or conducted outside the ordinary course of business.  Appx141-142.  Commerce also pointed out that Unicatch had not

41

demonstrated that the margins were aberrational in terms of individual quantity or unusual terms of sale. Appx140. Moreover, this Court has held that the "mere fact that a margin is unusually high does not mean it lacks probative value and hence cannot be used for corroboration." *Papierfabrik August Koehler AG v. United States*, 843 F.3d 1373, 1381 (Fed. Cir. 2016). Indeed, "'{t}he statute simply does not require Commerce to select facts that reflect a certain amount of sales, yield a particular margin, fall within a continuum according to the application of particular statistical methods, or align with standards articulated in other statues and regulations.'" *Id.* (citing *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016)).

Appellants have also failed to demonstrate that the transaction-specific margins used for corroboration are aberrational in terms of individual quantity. Appellants argue that the sales represent 0.016% of Pro-Team's transactions, and 0.0028% of its sales value. Appellants Br. at 38-39. But there simply exists no requirement that the corroborating transactions represent a minimum number or certain percentage of total sales. As this Court held in *Papierfabrik*, the fact that the unusually high sale margin used for corroboration represents only a miniscule amount of the total sales does not render it improper for Commerce to rely on the margin. *Id.*, 843 F.3d at 1382; *see also PSC VSMPO-AVISMA Corp. v. United States*, 498 Fed. App'x 995 (Fed. Cir. 2013); *PAM, S.p.A. v. United States*, 582

42

F.3d 1336, 1340 (Fed. Cir. 2009). Furthermore, the Pro-Team transaction-specific margins Commerce relied upon have quantities of [number] kg and [number] kg, similar to the quantities of other transaction-specific margins in Pro-Team's margin results, which run from [number] kg to [number] kg. Appx140-141. In sum, "the results are accurate, the results contain transaction-specific margins calculated [characterization] the petition rate, and the occurrence of a transaction-specific margin [characterization] the petition rate is not [description of occurrences]

Appx141. Moreover, the pertinent issue is whether the rate chosen by Commerce has probative value, not whether it is representative of Pro-Team's margins or Unicatch's margins presuming Unicatch had cooperated fully. SAA at 870, 19 U.S.C. §1677e(d)(3).

Even assuming, for argument's sake, that appellants could demonstrate that Commerce did not adequately corroborate the petition rate using the transaction-specific approach, this would not render the corroboration unsustainable, given that Commerce also corroborated the 78.17 percent petition rate pursuant to the component method. Appx132-133, Appx142. Using this method, Commerce corroborated the petition's normal value and net U.S. prices against Pro-Team's normal value and net U.S. prices. *Id.* Not only were the normal values from the petition within the range of the normal value calculated for Pro-Team, but [number] of calculated normal values were [characterization] to the normal value

from the petition. Appx133, Appx142. The same holds true for Pro-Team's

calculated U.S. prices, with [number] of calculated U.S. prices [characterization]

to the U.S. price from the petition. Appx133.

Appellants attempt to undermine Commerce's component approach

altogether, contending that "the petition's net U.S. sales prices and NVs fall{ing}

within the norm of {Pro-Team}'s net prices and NVs does not corroborate whether

the petition's dumping margin (the difference between the net U.S. price and NV)

can be relied on as an AFA rate in this case." Appellants Br. at 43. However, this

Court has held that, "so long as the data is corroborated, Commerce acts within its

discretion when choosing which sources and facts it will rely on to support an

adverse inference." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d

1330, 1339 (Fed. Cir. 2002). Here, Commerce examined the record and

demonstrated that the petition's range of normal value and net U.S. prices was well

within the same range as Pro-Team, an acceptable methodology consistent with

Commerce's past practice. *See, e.g.,* Yarn from India IDM at cmt. 7. "Commerce

is not required to 'corroborate corroborating data,' but merely satisfy itself that it

has probative value." *Papierfabrik*, 843 F.3d at 1382 (quoting *Nan Ya*, 810 F.3d at

1340). Appellants fail to undermine either method of corroboration, much less

both; thus, the Court should sustain Commerce's selection of the AFA rate.

C.    The 78.17 Percent Rate Is Not Punitive

Commerce's application of the 78.17 percent petition margin as the adverse

facts available rate properly accounts for the totality of the circumstances and is

not punitive.  Commerce acted in accordance with its statutory obligations by

corroborating the 78.17 percent margin using two different methods; accordingly,

consistent with this Court's precedent, the selected margin is not punitive.  *See*

*Papierfabrik*, 843 F.3d 1382 ("as long as a rate is properly corroborated according

to statute, Commerce has acted within its discretion and the rate is not punitive.");

*see also Deacero*, 996 F.3d at 1300.  There is simply no further analysis the Court

must undertake, despite appellants' protestations to the contrary.

Even though it was not required to do so, Commerce nonetheless explained

in its remand redetermination why the chosen rate was not punitive and how it

accounts for Unicatch's circumstances.  Commerce has wide discretion when it

comes to selecting an adverse facts available rate for non-cooperating parties.  *See*

*F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027,

1033 (Fed. Cir. 2000) ("Commerce, not the courts, must make determinations as to

proper anti-dumping margins.").  And, while the rate should not be unduly

punitive, it should have "some built-in increase intended as a deterrent to non-

compliance." *Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1373 (Fed. Cir.

2014).  "Commerce is in the best position, based on its expert knowledge of the

market and individual respondent, to select adverse facts that will create a proper deterrent to non-cooperation with its investigations and assure a reasonable margin." *De Cecco*, 216 F.3d at 1032.

As recognized by this Court and the trial court, when respondents are allowed to make repeated errors or omissions in reporting information, they control the timeline and the order in which information is received, which enables them to manipulate the administrative process for their own benefit. *See, e.g., Viet I-Mei Frozen Foods Co. v. United States*, 839 F. 3d 1099 (Fed. Cir. 2016); *NSK Ltd. v. United States*, 481 F. 3d 1355 (Fed. Cir. 2007); *Nippon Steel Corp. v. United States*, 337 F. 3d 1373 (Fed. Cir. 2003); *Diamond Sawblades Mfrs.' Coal v. United States*, 415 F. Supp. 3d 1365 (Ct. Int'l Trade 2019).

In claiming that the 78.17 percent rate does not account for the totality of the circumstances, appellants continue to blame Commerce for Unicatch's own missteps and ignore the inherent advantages to be gained by controlling the administrative process. Appellants Br. at 48-49. In doing so, appellants fail to mention Commerce's "three detailed requests for a complete reconciliation, {and that} Commerce reasonably expected more forthcoming responses from Unicatch." Appx134. In considering the totality of the circumstances, Commerce determined that Unicatch's lack of cooperation impeded Commerce's administrative review. Appx134, Appx308-309. As Commerce explained, this delay and consistent

46

failure of performance limits the time that Commerce and other interested parties have to examine the information. *Id.* Additionally, such uncooperative behavior results in respondents limiting the breadth and scope of questions that can be raised by other parties or by Commerce itself. *Id.*

Appellants' attempt to disregard Unicatch's own behavior, as well as certain of Pro-Team's transaction-specific margins, is not "an argument for the 'totality of the circumstances,' but rather a plea for any non-advantageous record evidence to be disregarded." Appx143. Commerce thus reasonably determined it would not be appropriate to adjust the adverse facts available rate downward because Unicatch provided some, but not all, of the required information, because to "do so would be to allow a respondent to cooperate only on those matters which it chooses and to incentivize a respondent's preferable selection and omittance of any information it considers to be advantageous." *Id.*

Nor is the 78.17 percent AFA rate punitive. Commerce reasonably acted to assign a rate to encourage future cooperation and serve as a deterrence to Unicatch. By way of example, in *Viet I-Mei*, this Court held that the assigned country-wide rate, which was significantly higher than the calculated rate assigned to another respondent, was appropriate to use as AFA to ensure the successor-in-interest did not benefit from refusing to cooperate with Commerce's requests for complete information. *Id.*, 839 F.3d at 1110. Here, Commerce assigned the highest rate

47

available to it that was also sufficiently adverse to encourage future cooperation.
Appx142-143. Commerce should not be forced to assign Unicatch a rate close to
the lower calculated rates from a segment of the proceeding, because doing so
would disincentivize cooperation by allowing it to benefit from another party's
cooperation, despite Unicatch not cooperating fully. *See, e.g., Hubbell Power Sys.
v. United States*, No. 15-00312, 2019 WL 6174713, at *3-4 (Ct. Int'l Trade Nov.
20, 2019) (sustaining application of a 206 percent adverse facts available rate
rather than plaintiff's suggestion of 55.16 percent or lower).

Appellants appear to argue for an AFA rate of 9.83 percent or even lower—a
rate more "representative" of Pro-Team's rate—but this is not the standard for
choosing an AFA rate, and, indeed, would defeat the purposes of an AFA rate,
which are to ensure that the uncooperative respondent does not receive a more
favorable margin than they would have if they cooperated and to deter non-
compliance. Here, Unicatch is arguing for an AFA rate even lower than the 34.20
percent rate it received in the preliminary results—an absurd outcome. Appx5937.

The assigned rate of 78.17 percent has been corroborated to the extent
practicable from the sources that are reasonably at Commerce's disposal, and by
using two different, but both appropriate, methods. Accordingly, the rate is not
punitive. And, in any event, Commerce further explained its examination of the
totality of the circumstances and its reasoning for the rate being non-punitive in its

48

remand redetermination.  The Court should reject appellants' arguments and

sustain Commerce's application of the facts available with an adverse inference

rate of 78.17 percent for Unicatch.

IV.    Commerce's Use Of The Expected Method To Calculate The Rate For Non-
       Selected Respondents Was Lawful And Supported By Substantial Evidence

       Commerce's use of the expected method to calculate the rate for non-

examined respondents was in accordance with law and supported by substantial

evidence.  Commerce calculated the rate for the non-examined companies using a

weighted average of the *de minimis* and AFA rates of the mandatory respondents.

Appx327.  In doing so, Commerce adhered to the expected method, the statutory

framework, and relevant precedent, and appellants cannot demonstrate that

Commerce should have been required to depart from the expected method.

       A      The Expected Method Is The Default, And Assumes The Largest
              Respondents Are Representative

       As stated above, when dumping margins for all individually-examined

entities are zero, *de minimis*, or determined based entirely on adverse facts

available, Commerce "may use any reasonable method to establish the estimated

all-others rate for exporters and producers not individually investigated, including

averaging the estimated weighted average dumping margins determined for

exporters and producers individually investigated."  19 U.S.C. § 1673d(c)(5)(B).

The SAA directs that, in this situation, "{t}he expected method in such cases will

49

be to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." SAA at 873.

This Court has upheld Commerce's application of the expected method in administrative reviews, explaining that the general assumption underlying the statutory framework is that "the individually examined respondents account for a majority of the market during the relevant period, and are representative at the very least in terms of aggregate volume." *Albemarle*, 821 F. 3d at 1353; *see also* 19 U.S.C. § 1677f-1(c)(2) (allowing Commerce to limit its examination exporters or producers, which accounts for the largest volume of subject merchandise that can be reasonably examined, when it is not practicable for Commerce to examine each company individually). "The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." *Albemarle*, 821 F.3d at 1353; *see also Changzhou Hawd Flooring Co. v. United States*, 848 F. 3d 1006, 1012 (Fed. Cir. 2017) ("Thus, the mandatory respondents in this matter are assumed to be representative."). "The statute assumes that, absent such evidence, reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters." *Albemarle*, 821 F. 3d at 1353. This Court further explained that, to divert from the expected method, substantial evidence

must demonstrate that that the non-examined companies' dumping behavior would be different than that of the mandatory respondents. *Id.*; *see also Changzhou Hawd*, 848 F. 3d at 1012 ("Under *Albemarle*, Commerce could not deviate from the expected method unless it found, based on substantial evidence, that the separate rate firms' dumping is different from that of the mandatory respondents.").

Moreover, as the trial court stated, this Court's precedent "confirm{s} that the expected method is the default method and that the burden of proof lies with the party seeking to depart from the expected method (or with Commerce as the case may be." Appx350-351. To expect Commerce to engage in a data collection exercise with non-selected respondents when it adheres to the expected method "would be inconsistent with" the statutory directive to limit its examination to the largest respondents and "would defeat the purpose of the respondent selection process." Appx354.

B.    Commerce Properly Used The Expected Method To Calculate The Non-Examined Respondents' Rate

Appellants claim that the expected method results in a rate not reasonably reflective of their potential margins. Appellants Br. at 57-58. But, as recognized in *Albemarle*, the rates of the examined respondents are assumed to be representative of the non-examined respondents, particularly when no evidence on the record disputes that assumption. *Id.*, 821 F.3d at 1355. Here, using the

expected method, Commerce calculated the weighted average of the *de minimis* rate of Pro-Team and the AFA-based rates of Unicatch and Bonuts. And, as Commerce determined, no substantial record evidence demonstrates that the rate applied to the non-examined companies is not reasonably reflective of their potential dumping margins. Appx335.

Appellants also studiously ignore that rates based on total adverse facts available have been frequently assigned to mandatory respondents throughout the history of the order, and that even the rates for individual respondents have fluctuated greatly between segments. Appx337-338. Indeed, Pro-Team, Bonuts, and Unicatch have all received AFA rates at some point during the proceeding.[6] There is no compelling reason to suppose that adverse facts available rates assigned to mandatory respondents are less representative than zero rates or *de minimis* ones. Simply put, there is no evidence or logic to presume that a respondent, once selected for individual review, will fully cooperate.

Appellants also argue that Bonuts's data should have been excluded because it was not a representative respondent. Appellants Br. at 61. But the "evidence" in favor of appellants' theory consists of unsupported statements previously made by Pro-Team and Bonuts, and not accepted by Commerce. Indeed, Commerce

---

[6] The trial court also noted that the 35.30 percent all-others rate complained about here is similar to the 27.69 percent rate received by Unicatch in a subsequent review. Appx357.

determined that, like [description]                    are subject to the

antidumping duties under the order, and that the record provided no basis to

disqualify any of the data on this basis.  Appx481-482.  Commerce also evaluated

Pro-Team's other claim regarding [noun] and determined that there was insufficient

evidence to suggest CBP data relating to entries from Bonuts are unreliable.

Appx482.  Commerce also found that CBP data could feasibly be used as facts

available under 19 U.S.C. § 1677e(a) to calculate a weighted average when the

reported volume data is missing from the record.  Appx327.

Additionally, Commerce found Pro-Team's claims regarding Bonuts to be

unsubstantiated.  Appx482.  For its own submission, Bonuts did not submit any

evidence to support its claims.  And, without Bonuts's cooperation, Commerce

could not verify whether it was representative.  Appx358.  Consequently,

Commerce found that Bonuts's claims were unpersuasive, keeping Bonuts as a

mandatory respondent and applying AFA rather than deselecting it as a mandatory

respondent.  Appx5913-5914, Appx1; *see also* Appx339.  Because mandatory

respondents are presumed to be representative and there was no record evidence to

support claims to the contrary, Commerce appropriately included Bonuts's rate in

calculating the non-examined respondents' rate.

Finally, appellants suggest reopening the record to allow them to place

information showing that the rates are not reasonably reflective.  Appellants Br. at

61-62. But Commerce is not required to reopen the record on remand. Commerce found that, because "no additional information is required for Commerce to determine the rate for the non-individually examined respondents," reopening the record was unnecessary. Appx338. This determination is within Commerce's discretion and should not be disturbed. *See, e.g., Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017). Additionally, requiring Commerce to obtain additional information from non-selected respondents would defeat the purpose of the respondent selection process. *PrimeSource Bldg. Prods. v. United States*, 581 F. Supp. 3d 1331, 1341 (Ct. Int'l Trade 2022).

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court affirm the judgment of the Court of International Trade.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

/s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Director

OF COUNSEL:                        /s/Sosun Bae
VANIA WANG                         SOSUN BAE

54

Senior Attorney
U.S. Department of Commerce
Office of the Chief Counsel For Trade
    Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 305-7568
Email: Sosun.Bae@usdoj.gov

April 12, 2023

Attorneys for Defendant-Appellee

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify under penalty of perjury that the attached brief is proportionately spaced using Microsoft Word, uses a Times New Roman typeface in 14 point font size, and, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), contains 11,717 words.


<u>/s/ Sosun Bae</u>
SOSUN BAE