<u>**2022-2241**</u>
## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PRO-TEAM COIL NAIL ENTERPRISE INC., PT ENTERPRISE INC.,
PRIMESOURCE BUILDING PRODUCTS, INC., S.T.O. INDUSTRIES, INC.,
Plaintiffs,

UNICATCH INDUSTRIAL CO., LTD., TC INTERNATIONAL, INC., HOR
LIANG INDUSTRIAL CORPORATION, ROMP COIL NAILS INDUSTRIES
INC.,
Plaintiffs-Appellants,

v.

UNITED STATES, MID CONTINENT STEEL & WIRE, INC.,
Defendants-Appellees.

---

Appeal from the United States Court of International Trade in
Case No. 18-cv-00027, Chief Judge Mark A. Barnett

---

### REPLY BRIEF OF PLAINTIFFS-APPELLANTS

Ned H. Marshak
Max F. Schutzman
Andrew T. Schutz*

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
599 Lexington Avenue, 36th Floor
New York, NY 10022
(212) 557-4000

*1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Date: June 2, 2023

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 22-2241 |
| **Short Case Caption** | Pro-Team Coil Nail Enterprise Inc. v. US |
| **Filing Party/Entity** | Unicatch Industrial Co., Ltd., TC International, Inc., Hor Liang Industrial Corp., and Romp Coil Nails Industries Inc. |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/02/2023

Signature:  /s/ Ned H. Marshak

Name:  Ned H. Marshak

**FORM 9. Certificate of Interest**

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Unicatch Industrial Co., Ltd. | | |
| TC International, Inc. | | |
| Hor Liang Industrial Corp. | | |
| Romp Coil Nails Industries Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable        ☐  Additional pages attached

| | | |
|---|---|---|
| Eve Q. Wang | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑  None/Not Applicable        ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable        ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## Table of Contents

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................1

   I.   COMMERCE'S DECISION THAT UNICATCH'S DUMPING MARGIN
       SHOULD BE BASED ON TOTAL AFA IS NOT SUPPORTED BY
       SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW...................1

   II.  COMMERCE'S DECISION TO APPLY A 78.17 PERCENT AFA RATE
       TO UNICATCH IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE
       AND IS CONTRARY TO LAW.................................................................15

   III. COMMERCE'S CALCULATION OF A 35.30 PERCENT RATE FOR
       HL/ROMP IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND
       IS CONTRARY TO LAW…. .....................................................................20

CONCLUSION ..................................................................................28

## TABLE OF AUTHORITIES

**CASES**

*Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) ................................................................................. 30, 31, 32

*Baroque Timber Indus. (Zhongshan) Co. v. United States*, 971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014) ..................................................................... 27

*BMW of N. Am. LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019) ........... 19, 23

*Bosun Tools Co.*, 493 F. Supp. 3d at 1357, *aff'd* Case No. 2021-1930, 2022 WL 94172, at *1 (Fed. Cir. Jan. 10, 2022) ..................................................... 26, 28, 29

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ........................................................................... 27

*China Steel Corp. v. United States*, 393 F. Supp. 3d 1322 (Ct. Int'l Trade 2019) .... 3

*Corinth Pipeworks Pipe Industry Sa & Cpw America Co., v. United States*, No. 22-00063, 2023 WL 3149291, at *1 (Ct. Int'l Trade Apr. 28, 2023) ................. 15, 16

*Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283 (Fed. Cir. 2021) .... 5, 20, 21, 22

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,* 216 F.3d 1027 (Fed. Cir. 2000) ............................................................................ 22

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 C.I.T. 1150 (2001) ............................................................................................... 4, 14

*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) .. 27

*GODACO Seafood Joint Stock Co. v. United States*, 494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021) .......................................................................................... 28

*Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021) ............................................................................................... 13

*Hyundai Elec. & Energy Sys. v. United States*, Case No. 2021-2312, 2022 WL 3273811, at *1 (Fed. Cir. Aug. 11, 2022) ............................................................4

*Linyi Chengen Imp. & Exp. Co. v. United States*, 539 F. Supp. 3d 1269 (Ct. Int'l Trade 2021).......................................................................................................28

*Mannesmannrohren-Werke AG v. United States,* 24 C.I.T. 1082 (2000)...............14

*Mid Continent Steel & Wire, Inc. v. United States*, No. 15-00213, 2023 WL 2755657, at *1 (Ct. Int'l Trade Apr. 3, 2023).....................................................25

*Mukand, Ltd. v. United States*, 767 F.3d 1300 (Fed. Cir. 2014).............................11

*Navneet Publications (India) Ltd. v. United States*, 999  F. Supp. 2d 1354 (Ct. Int'l Trade 2014).......................................................................................................27

*Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373 (Fed. Cir. 2016)..22, 23

*PrimeSource Bldg. Prod., Inc. v. United States*, 581 F. Supp. 3d 1331 (Ct. Int'l Trade 2022).......................................................................................................25

*Shenzhen Xinboda Industrial Co. Ltd. v. United States*, 180 F. Supp. 3d 1305 (Ct. Int'l Trade 2016).................................................................................................27

*Tung Mung Dev. Co. v. United States,* 25 C.I.T. 752 (2001) .................................13

*Zhejiang Dunan Hetian Metal Co.*, 652 F.3d 1333 (Fed. Cir. 2011) ........................4

## OTHER AUTHORITIES

Statement of Administrative Action ("TAA") to Accompany the Uruguay Round Agreements Act of 1994, H.R. Doc. No. 103–316, 1994 U.S.C.C.A.N. ........ 6, 26

## ADMINISTRATIVE DECISIONS

*Certain Quartz Surface Products from India: Final Results of Antidumping Duty Administrative Review; 2019-2021*, 88 Fed. Reg. 1,188 (January 9, 2023) ........29

Certain Steel *Nails* From *Taiwan*, 82 Fed. Reg. 55,090 (Dep't Commerce Nov. 20, 2017) ..................................................................................................................23

*Certain Steel Nails From Taiwan: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 28959-01 (May 20, 2015) ..................................................23

*Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China; 2019-2021*, 27 ITADOC 67674 (November 9, 2022) ............................................................................................29

*Lined Paper Product From India*, 71 Fed. Reg. 45,012 (Dep't of Commerce Aug. 8, 2006) (final results) ...................................................................................... 10, 11

*Prestressed Concrete Steel Wire Strand From Mexico*, 68 Fed. Reg. 68,350 (Dep't of Commerce Dec. 8, 2003) (final results) ...........................................................12

## INTRODUCTION

This brief is filed on behalf of plaintiffs-appellants Unicatch Industrial Co., Ltd. and TC International Inc. (collectively "Unicatch") and Hor Liang Industrial Corporation and Romp Coil Nails Industries Inc. (collectively "HL/Romp") in reply to the response briefs filed by defendant-appellees, the United States ("Government") and Mid Continent Steel & Wire, Inc. ("Mid Continent") in Unicatch and HL/Romp's appeal of the Department of Commerce's ("Commerce") final results of the first annual review of the Antidumping Duty ("ADD") Order on steel nails from Taiwan ("Taiwan Nails AR1"), as modified after decisions of the Court of International Trade ("Trial Court"). Unicatch and HL/Romp challenge Commerce's decisions to calculate: (1) Unicatch's dumping margin at a rate of 78.17 percent based on total adverse facts available ("AFA"); and (2) HL/Romp's dumping margin at 35.30 percent by including Unicatch and Bonuts' total AFA rates in the calculation methodology.

## ARGUMENT

**I.    COMMERCE'S DECISION THAT UNICATCH'S DUMPING MARGIN SHOULD BE BASED ON TOTAL AFA IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW**

Unicatch's Opening Brief discussed the reasons why Commerce's decision to reject all of the data submitted by Unicatch in Taiwan Nails AR1 and in their place to apply a draconian 78.17 percent total AFA rate on Unicatch exports

1

should be reversed and remanded for further analysis. Unicatch's position is based on Commerce's failure to properly "consider the overall facts and circumstances of . . . {this}. . . . case, including the level of culpability' and 'the seriousness of the type of misconduct' committed by the uncooperative party' . . . {in this case, Unicatch} . . . before applying AFA." *China Steel Corp. v. United States*, 393 F. Supp. 3d 1322, 1337 (Ct. Int'l Trade 2019) (quoting *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301 (Fed. Cir. 2019)). Commerce's decision was "speculative in light of the record, which demonstrated that most of … {the proffered} . . . price information was reliable." *Hyundai Elec. & Energy Sys. v. United States*, Case No. 2021-2312, 2022 WL 3273811, at *4 (Fed. Cir. Aug. 11, 2022). Because Unicatch's transgression was its failure to provide Commerce with cost data in the form which Commerce believed was necessary (albeit without specifying that form), Commerce was required to "tread especially carefully." *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 C.I.T. 1150, 1177 (2001). It did not, and, accordingly failed to "devise a non-arbitrary way of distinguishing among errors." *Id.* Commerce's decision was especially egregious since "total facts available" can only be used by "Commerce in situations where none of the reported data is reliable or usable.'" *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d 1333, 1348 (Fed. Cir. 2011). Additionally, in employing an adverse inference in this case, Commerce failed to consider that Unicatch could not

possibly "benefit from its own lack of cooperation." Statement of Administrative

Action ("TAA") to Accompany the Uruguay Round Agreements Act of 1994, H.R.

Doc. No. 103–316, 1994 U.S.C.C.A.N. at 4199.

In response to Unicatch's arguments, the Government and Mid Continent

directed this court's attention to judicial decisions in other cases, based on other

facts, affirming Commerce's decisions to apply facts available, AFA and total

AFA, to other respondents. As discussed below, none of these decisions can be

used to justify the manner in which Commerce treated Unicatch; rather, they show

that Commerce's decision to apply AFA and total AFA to Unicatch crossed the

line of reasonableness which governs Commerce's actions.

In this case, **Unicatch did not:** (1) refuse to respond to Commerce's

questionnaires; (2) submit false information; (3) submit information which was not

supported by its accounting records maintained in the ordinary course of business;

or (4) submit documents or worksheets which were internally inconsistent or

misleading.[1] Rather, as discussed in detail in Unicatch's Opening Brief, Unicatch

submitted timely and accurate responses to Commerce's initial questionnaire

(Sections A (general information), C (sales to United States, including both export

---

[1] *See Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1297 (Fed. Cir. 2021) ("Commerce's decision to apply AFA to Deacero, based on Deacero's, at best, inconsistent representations, and failure to timely explain and meaningfully support those representations, is supported by substantial evidence.").

price and constructed export price sales), D (constructed value)), and to three supplemental questionnaires – the last of which, on June 27, 2017, **Appx5597-5598**, did not ask for further information relating to Unicatch's cost reconciliation.

Unicatch reasonably believed that its cost reconciliation complied with Commerce's requirements. As discussed, the product specific costs which Unicatch submitted in Ex. SSD-4, **Appx5380-5394**, tied to Unicatch's audited financial statement (see Ex. SSD-3, **Appx5378-5379**) and to Unicatch's Section D database (Ex. SSD-2, **Appx5367-5377)**. Material costs, labor costs, packing material costs, and processing fees were identical for subject merchandise reported in Unicatch's accounting records (Ex. SSD-4) and cost database (see Ex. SSD-2). The difference between product specific accounting record costs and database costs resulted from the manner in which Commerce requires respondents to report overhead. **Appx3951-3953, Appx4940-4941, Appx6032-6049.** Unicatch explained the differences between overhead costs reported in Exs. SSD-2 and SSD-4 in the text of its submissions. From these data, all of which were timely filed and none of which have been found to be inaccurate, Unicatch linked its product specific costs to its audited financial statement, and linked its product specific costs as recorded in its accounting system to the product specific costs reported in its Section D database. Unicatch also fully explained its cost reporting methodology to Commerce. Thus, the record contained all information necessary to complete

Unicatch's cost reconciliation. And when Commerce did not question Unicatch's reconciliation in its third supplemental questionnaire and relied on Unicactch's costs in its Preliminary Determination, Unicatch reasonably believed that Commerce had accepted its cost reporting and cost reconciliation.

Commerce never expressly advised Unicatch that to avoid total AFA it was required to submit one summary Table which began with data on Unicatch's audited financial statement and ended with cost of manufacturing data in Unicatch's Section D response. Commerce did not provide Unicatch with a template for its cost reconciliation. Commerce's May 16, 2017, Second Supplemental Questionnaire, at Question 1(a), expressly advised Unicatch that its cost reconciliation should begin with "Unicatch's audited financial statement (and not the untranslated income statement from Exhibit D-13)." **Appx4335.** The questionnaire, however, did not expressly advise Unicatch as to how to report the ending value in Unicatch's "extended TOTCOM as per the submitted costs database," and did not provide Unicatch with a template for submitting these data.

Petitioner's June 13, 2017 pre-preliminary AFA allegation, **Appx5444-5463,** did not include a claim that Unicatch's cost reconciliation was incomplete or inaccurate. On June 21, 2017, Petitioner replied to Unicatch's June 19, 2017, submission, again claiming that Commerce should calculate Unicatch's margin based on AFA because of defects in Unicatch's Section C sales database, not for

anything related to costs. **Appx5582-5591**. Again, Petitioner did not claim that any alleged defects in Unicatch's cost reconciliation justified resort to AFA.

On June 27, 2017, Commerce extended the date for the Preliminary Determination from June 30, 2017 to July 31, 2017, citing multiple reasons for the extension. **Appx5597-5598.** These reasons included Petitioner's claims regarding PT and Unicatch and "numerous complex issues in the proceeding, including home market sales reporting, database revisions, and other issues such as the appropriate calculation of constructed value profit." In this Memorandum, Commerce did not reference any alleged issues relating to Unicatch's reporting of costs, or its cost reconciliation.

On June 29, 2017, Commerce issued a third supplemental questionnaire to Unicatch, **Appx5593-5596**, to which Unicatch replied on July 6, 2017. **Appx5599-5615.** The questionnaire consisted of one question, relating to sales by Unicatch to its affiliated U.S. customer, TC International, for the period January – July 2015. In this letter, Commerce did not ask any additional questions regarding Unicatch's cost reconciliation.

Commerce issued its Preliminary Determination on July 31, 2017. **Appx5893-5902**. It published the results on August 7, 2017, accompanied by a Decision Memorandum. **Appx5903-5923.** Commerce noted that it "calculated the cost of materials and fabrication, G&A expenses and interest based on information

submitted by Unicatch in its original and supplemental questionnaire responses, except in instances in which we determined that the information was not valued correctly, as described below." **Appx5920.** Commerce stated that it had "examined Unicatch's cost data and determined that our quarterly cost methodology is not warranted, and, therefore, we have applied our standard methodology of using annual costs based on Unicatch's reported data." **Appx5922.** Commerce concluded that based on our analysis of Unicatch's questionnaire responses, we have made no adjustments to Unicatch's reported COP. **Appx5922; see also Appx5623** (Preliminary Analysis Memorandum). Nowhere in this decision did Commerce question the veracity of Unicatch's costs reporting or the format or content of Unicatch's cost reconciliation.

The record in this case reveals that Unicatch's responses to Commerce's cost reconciliation questions were timely, accurate and comprehensive. The record also reveals that Commerce never expressly directed Unicatch to submit a reconciliation Table, and that Commerce appeared to be satisfied with Unicatch's response. Otherwise, Commerce would have asked for additional information regarding reconciliation in its third supplemental questionnaire. Furthermore, when Commerce decided to postpone its preliminary determination, it did not list as a reason any deficiencies in Unicatch's cost reconciliation. In short, Unicatch's failure to submit data in the manner in which Commerce wanted the data submitted

was not willful or deliberate; Unicatch had nothing to gain by not complying with all Commerce requests, and Commerce did not expressly advise Unicatch how Unicatch should cure the defect in its reporting. In light of these facts, Commerce's resort to total facts available, AFA, and total AFA should be reversed.

The judicial and administrative decisions upon which the Government and Mid Continent rely do not support their position; rather, these decisions are readily distinguishable from the facts in this case, and they show why Commerce's reliance on total AFA for Unicatch is contrary to law. For example, in *Lined Paper Product From India*, 71 Fed. Reg. 45,012 (Dep't of Commerce Aug. 8, 2006) (final results) and accompanying IDM at cmt. 14, Commerce "issued a third supplemental section D questionnaire on March 16, 2006, along with a cost reconciliation worksheet outline, which the Department prepared based on Navneet's prior submission." In that questionnaire, "the Department requested Navneet to provide the missing figures in the cost reconciliation outline schedule, along with an explanation and supporting documentation for each reconciling item." Commerce continued:

> Because Navneet failed to provide the production quantity reconciliation schedule in its previous two supplemental section D questionnaire responses, the Department specifically requested in the third supplemental section D questionnaire that Navneet reconcile the production quantity from the cost database to either the sales quantity or the production quantity in the POI production quantity reconciliation schedule.

8

> The Department clearly warned Navneet with the issuing of the third supplemental section D questionnaire that its repeated failure to provide the requested information has resulted in a questionnaire response that the Department would not be able to adequately analyze and rely upon in its current form. Navneet clearly knew that the Department was not going to issue another supplemental questionnaire and all of its deficiencies had to be resolved in its third supplemental questionnaire response in order for the Department to calculate an accurate antidumping margin.

*Id*.

In *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306 (Fed. Cir. 2014), the Court described the interaction between Commerce and the respondent as follows:

> Commerce requested this information from Mukand on five separate occasions—in the initial questionnaire and in four supplemental questionnaires. In each of the supplemental questionnaires, Commerce explained why it was unsatisfied with Mukand's response and reiterated both the type of information it needed and why it was important. Commerce even went so far as to provide Mukand with a sample chart to complete and encouraged Mukand to reach out if it needed assistance or additional clarification. Commerce further warned Mukand that its continued failure to provide the requested information may force Commerce to resort to facts otherwise available.

In contrast to *Lined Paper Products* and *Mukand,* in Taiwan Nails AR1 Commerce never provided Unicatch with a "cost reconciliation worksheet outline," or "a sample chart to complete" and in its third supplemental questionnaire, did not ask Unicatch any additional questions regarding its cost reconciliation, let alone advise Unicatch that its prior submissions were not acceptable.

9

In *Prestressed Concrete Steel Wire Strand From Mexico*, 68 Fed. Reg. 68,350 (Dep't of Commerce Dec. 8, 2003) (final results) and accompanying IDM at cmt. 6, Commerce concluded that the "reconciliation worksheets and the revised cost database presented at verification failed to demonstrate that Cablesa accounted for all costs related to the production of the merchandise under investigation." In contrast, in the instant case, Unicatch established that it had captured all costs in its reconciliation.  However, it failed to complete a worksheet that it did not realize it needed to complete. In addition, in *Prestressed Concrete Steel Wire Strand,* Commerce concluded that the respondent "failed to include processing costs for covering the subject merchandise at one of its divisions, failed to include the adjustment for the difference between the book and physical inventory count, and did not include the actual yield loss experienced by the company during the cost reporting period."  In contrast, in the instant case, Commerce did not conclude that Unicatch failed to report all of its costs.

In *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1088–89 (Fed. Cir. 2021), this Court affirmed Commerce's decision to rely on AFA, because Commerce had provided the respondent with a detailed schedule of required items. In contrast, in this case, Commerce request consisted of a cryptic reference to data needed, without explaining the required format and the consequences of not following a format which had never been specified.

In *Tung Mung Dev. Co. v. United States,* 25 C.I.T. 752, 786 (2001) the Court found that "Commerce's findings show that YUSCO failed to report approximately one fifth of its home market sales, a reporting failure that goes to the heart of a dumping investigation." In the instant case, Unicatch reported all of its costs, but failed to recognize that its explanation as to how its reported costs reconciled to its financial statement was not satisfactory.

In *Mannesmannrohren-Werke AG v. United States,* 24 C.I.T. 1082, 1086 (2000), the Court affirmed Commerce's decision to rely on AFA because Commerce properly concluded that the respondent's representations to Commerce "were materially false." In the instant case, Commerce does not allege that Unicatch's reconciliation was materially false; it claims that the reconciliation was incomplete.

In *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 27 C.I.T. 1059, 1061 (2003), the Court affirmed Commerce's determination to rely on AFA after the respondent failed to provide credible responses to Commerce's inquiries, pursuant to the Court's Order in *Fujian I*, on November 27, 2001, well after Commerce's on-site verification. In this case, Unicatch is asking the Court to allow the company to complete its cost reconciliation in a manner which is satisfactory to Commerce. If, upon remand, Unicatch is unable to complete its reconciliation,

Commerce would be justified in resorting to AFA. Unicatch is confident that it can

complete Commerce's chart, now that it realizes what Commerce is requesting.

Finally, and most recently, in *Corinth Pipeworks Pipe Industry Sa & Cpw*

*America Co., v. United States*, No. 22-00063, 2023 WL 3149291, at *1–2, 12 (Ct.

Int'l Trade Apr. 28, 2023), the court affirmed Commerce's decision to rely on AFA

based on the following description of the manner in which Commerce requested

cost data:

> In the initial questionnaire, Commerce directed Corinth to
> report per-unit COP and CV figures based on the company's
> "actual costs incurred ... during the period of review {"POR"},
> as recorded under [its] normal accounting system." . . .
> Commerce emphasized that "[t]he CONNUM5 specific COP
> and CV figures {provided} ... must reconcile to the actual
> costs reported in your company's normal cost accounting
> system and to the accounting records used by your company to
> prepare its financial statements." Id. at D-10. To accomplish
> this goal, **Commerce provided a sample reconciliation** for
> Corinth to follow, directing Corinth to take "a 'top-down'
> approach (e.g., financial statements to per-unit cost), starting
> with cost of sales from the financial statements and proceeding
> step-by-step down through cost of manufacturing {("COM")}
> for the reporting period to the summation of the reported per-
> unit costs."
>
> Corinth responded timely to the initial questionnaire, but
> Commerce found that the company's response regarding
> Section D contained deficiencies. . . . Accordingly, Commerce
> issued its first supplemental questionnaire, directing Corinth,
> "{a}s requested, {to} provide worksheets in the format shown
> below, reconciling the total POR COM to the total of the per-
> unit manufacturing costs submitted to Commerce" and to
> "{i}dentify and quantify" various reconciling items.

Commerce then issued a second supplemental Section D questionnaire, warning Corinth that its "section D and the supplemental D responses lacked adequate descriptions of {its} response methodology." . . . Commerce further explained that "{the company's} extensive calculation worksheets and reconciliation are difficult to interpret because of the lack of adequate descriptions as to the methodology used in the normal records or in {its} reporting to Commerce." <u>Id.</u> Commerce asked Corinth to explain, <u>inter alia</u>, why Corinth found it necessary to include reported costs for months outside the POR and why the company was "unable to generate a single COM report from its system." <u>Id.</u> at 3–4. Commerce also requested explanations for certain steps, lines of data, and definitions contained in Corinth's submitted worksheets. <u>Id.</u> at 4.

*Id.* (emphasis added).

The manner in which Commerce requested and analyzed Corinth's cost data is distinctly different from the manner in which Commerce treated Unicatch.  In *Corinth*, Commerce provided a "sample reconciliation" in its initial questionnaire. Then, in its first supplemental Commerce asked Corinth to "provide worksheets in the format shown below." And then in its second supplemental questionnaire, Commerce expressly advised Corinth as to the deficiencies in its response and "requested explanations for certain steps, lines of data, and definitions contained in Corinth's submitted worksheets." In contrast, Commerce never provided Unicach with a sample reconciliation, never asked Unicatch to provide worksheet in a specified format, and never asked specific questions which Unicatch was unable or unwilling to answer.

These judicial and administrative decisions underscore the deficiencies in Commerce's analysis of Unicatch's cost reconciliation submissions. Commerce and the courts have  recognized the need to tread carefully in relying on total AFA when there is no record evidence that a party (1) failed verification; or (2) refused to respond to Commerce's questionnaires; or (3) submitted false information; or (4) submitted information which was not supported by its accounting records maintained in the ordinary course of business; or (5) submitted documents or worksheets which were internally inconsistent or misleading. In the absence of these clear defects in a respondent's conduct, total AFA should not be applied unless Commerce expressly asks for certain data in a specified format, and after the party does not follow Commerce's express instructions, Commerce asks again, expressly reminding the party of the consequences of its failure. Commerce should not rely on total AFA in Unicatch-like situations when Commerce's instructions are not explicit. And Commerce should not rely on total AFA when a party submits the data needed to respond to a questionnaire, albeit not in the format which Commerce would have like to have received, but had never advised the party of that format.

The Government and Mid Continent's inability to provide this court with administrative and judicial precedent establishing that total AFA is warranted in a factual scenario similar to that which exists in this case constitutes an important

reason why this Court should reverse Commerce's decision.  Unicatch recognizes

that Commerce has broad discretion in interpreting the law, and that the standard

of review requires that the courts give the benefit of the doubt to Commerce. But in

this case, Commerce has crossed the line of reasonableness and fairness which is

the cornerstone of its authority. Commerce has treated Unicatch in the same

manner as it treats the most egregious offenders and it has acted in this manner

when Commerce itself failed to provide the same express instructions as it has in

other cases. It has treated similarly situated respondents differently and it has failed

to recognize that more is needed from Commerce before it rejects all of a

respondent's comprehensive, timely filed and accurate submissions.

## II.  COMMERCE'S DECISION TO APPLY A 78.17 PERCENT AFA RATE TO UNICATCH IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW

Unicatch's Opening Brief discusses the reasons why Commerce's decision

to apply a 78.17 percent AFA rate to Unicatch was not supported by substantial

evidence and was contrary to law.  First, Unicatch showed that Commerce's

corroboration analysis should be rejected because the margins on the two sales

above the 78.17% Petition rate were approximately 270 percent and 130 percent.

**Appx6950-6951; Appx6964-6968.** These two sales are aberrational outliers, with

respect to their significance (number, quantity and value) and proximity to the

norm. The weighted average margin for the two outlier sales (189.27 percent) is

15

infinitely higher than PT/Pro-Team's de minimis margin and 950 percent higher

than the next highest PT/Pro-Team margin of 19.83 percent, a margin which is

one-fourth of the AFA rate. **Appx6950-6951; Appx6964-6968.** PT/Pro-Team

reported 742 observations with margins between zero and 20 percent; the

remaining 11,797 observations had negative margins. **Appx6950-6951;**

**Appx6964-6968.**

Unicatch also established that applying a 78.17 percent total AFA rate to

Unicatch is unreasonable, and, accordingly, unlawful, because Commerce is

required to examine "the totality of the circumstances in selecting an AFA rate,

including, if relevant, the seriousness of the conduct of the uncooperative party."

*BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1302 (Fed. Cir. 2019). It also

is required to consider whether the rate is "unduly punitive." *Id*. In the instant case,

Unicatch submitted all of the underlying data needed to complete is cost

reconciliation and showed how its product specific costs tied to its audited

financial statement and to its Section D cost database. Commerce applied total

AFA, and a 78.17 percent rate merely because Unicatch failed to fully complete a

reconciliation worksheet which Commerce had never advised was required.

Unicatch's mistake does not come close to being as serious a fault as the conduct

of a respondent who refuses to participate in a review, submits fraudulent data or

documents, refuses (or is unable) to submit source documents, or who fails

verification. Yet Commerce treated Unicatch in the same manner as it treats these other companies.

The Government and Mid Continent's Reply Briefs do not rehabilitate the errors in Commerce's analysis. For example, in *Deacero S.A.P.I. de C.V. v. United States,* 996 F.3d 1283, 1299–302 (Fed. Cir. 2021) this court followed the *BMW* rationale in affirming Commerce's decision to apply a 40.52 percent rate to a non-cooperative respondent. In reaching this decision, Commerce found that the highest Petition rate, 40.52 percent, "ha{d} probative value," because it was "both reliable and relevant" to Deacero. Commerce further demonstrated that its selected AFA rate was relevant because it aligned with transaction-specific "margin calculations for Deacero" from the 2013–2014 review, which were in "the range of or exceed{ed} ... 40.52 [percent . .. ." *Id*. at 1294. The Court then discussed the *BMW* rationale as follows:

> We agree, and common sense dictates, that Commerce should consider the overall facts and circumstances of each case, including the level of culpability of the non-cooperating party in an AFA analysis." *BMW*, 926 F.3d at 1301. It is well established both that "the purpose of" AFA is to incentivize cooperation, "not to impose punitive, aberrational, or uncorroborated margins," . . . .Commerce found that Deacero had "mischaracterized," "misrepresented," and "withheld critical information from Commerce," J.A. 1032–33, and, further, that Deacero failed to produce any records to support or clarify its representations when given the opportunity to do so, J.A. 1034. That is, Commerce considered the "unique factual circumstances" of Deacero's situation and its "level of

17

> culpability," *BMW*, 926 F.3d at 1302, and concluded that the highest Petition rate was appropriate, J.A. 1043.

*Id.* at 1300.

In contrast, in the instant case, the two sales upon which Commerce relied to corroborate the 78.17 percent Petition rate were aberrational outliers, whose dumping margins had no relationship to any other margins in PT's voluminous database (12,541 observations). **Appx6950-6951; Appx6964-6968.** Moreover, Commerce's *BMW* analysis with respect to Unicatch was fatally flawed. The 78.17 percent total AFA rate assigned to Unicatch was the same Petition rate Commerce would have assigned as AFA to any company, regardless of "the overall facts and circumstances of each case, including the level of culpability of the non-cooperating party." Assuming that this Court agrees with Commerce that total AFA is the appropriate remedy for Unicatch's transgression, Unicatch's failure to complete a reconciliation table (whose template Commerce did not place on the record in the same manner as it has in other cases) cannot reasonably be equated to the actions of a party who declined to respond to Commerce's questionnaires, submitted false or fraudulent data in response to a question, or "'mischaracterized,' 'misrepresented,' and 'withheld critical information from Commerce.'" *Deacero, supra,* at 1297.

This court's decision in *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,* 216 F.3d 1027, 1032 (Fed. Cir. 2000) continues to guide Commerce's selection of AFA rates today.

> Obviously a higher adverse margin creates a stronger deterrent, but Congress tempered deterrent value with the corroboration requirement. It could only have done so to prevent the petition rate (or other adverse inference rate), when unreasonable, from prevailing and to block any temptation by Commerce to overreach reality in seeking to maximize deterrence.

Finally, both the Government and Mid Continent rely on this court's decision in *Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed. Cir. 2016) to support their position in this case. Gov. Br. at 42, 44, 45; Mid Continent Br. at passim. While *Papierfabrik* contains language supporting selection of a high AFA rate based on the facts in that case, the nature of respondent's lack of co-operation which led to the AFA decision cannot be ignored. The court described respondent's conduct as follows.

> There is substantial evidence that Koehler engaged in an intentional transshipment scheme that caused it to withhold certain home-sales information from its responses to Commerce, an omission that impeded the investigation, and that it offered updated information only after the deadline for submitting data

*Id*. at 1379.

The contrast between Koehler's conduct and Unicatch's conduct cannot be ignored. *BMW* and *Deacero* require that Commerce "consider the overall facts

and circumstances of each case, including the level of culpability of the non-cooperating party in an AFA analysis." *BMW of N. Am. LLC*, 926 F.3d at 1301. In applying a 78.17 percent rate to Unicatch Commerce failed to follow this mandate. Accordingly, this court should reverse Commerce's selection of the 78.17 percent rate and should remand this case to Commerce's for further analysis.

## III.   COMMERCE'S CALCULATION OF A 35.30 PERCENT RATE FOR HL/ROMP IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW

Unicatch's Opening Brief discussed the reasons why this court should reverse Commerce's application of a 35.30 percent dumping margin to HL/Romp. Commerce calculated this rate for these fully co-operative non-selected respondents by weight averaging PT's zero percent dumping margin with the 78.70 margins assigned to Unicatch and Bonuts. **Appx0334-0338.** Commerce reasoned that "there is no evidence that the 35.30 percent rate determined for Hor Liang and Romp Coil in this review is not reasonably reflective of their potential dumping margins; neither is there evidence that demonstrates that this rate is clearly punitive." **Appx0338.**

This decision should be reversed because a 35.30 percent margin is not "reasonably reflective of potential dumping margins for non-investigated exporters or producers" such as HL/Romp. SAA, H.R. Doc. No. 103–316 at 873, 1994 U.S.C.C.A.N. at 4201.  In Taiwan Nails AR1, Commerce calculated a zero rate for

PT/Proteam based on prices and costs in AR1; in contrast, the 78.17 percent rate

applied to Unicatch and Bonuts was based on pre-investigation data from 2013

placed on the record by Petitioner with the intent to maximize potential margins.

**Appx0021, Appx6750-6751.**

Moreover, the 35.30 percent rate is aberrational compared to margins

calculated for cooperative respondents in the Taiwan Nails Order in three periods:

immediately before, during, and immediately after AR1. In the initial investigation

(immediately **before**) Commerce calculated rates of zero and 2.16 percent; in AR1

(**during**) the sole calculated rate was zero; in AR2 (**immediately after**) the

calculated rates were zero (PT) and 6.16 percent (Unicatch). *See PrimeSource*

*Bldg. Prod., Inc. v. United States*, 581 F. Supp. 3d 1331, 1343 (Ct. Int'l Trade

2022).[2]

---

[2] In the initial investigation, Commerce calculated rates of zero and 2.24 percent for the two mandatory respondents. *Certain Steel Nails From Taiwan: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 28959-01 (May 20, 2015). The de minimis rate was not challenged. The 2.24 percent rate was challenged and, as a result of litigation, has been reduced to 2.16 percent. *Certain Steel Nails From Taiwan*, 82 Fed. Reg. 55,090 (Dep't Commerce Nov. 20, 2017) (notice of court decision not in harmony with final determination in less than fair value investigation and notice of amended final determination). The litigation challenging the 2.16 percent rate has continued, and on April 3, 2023 the CIT remanded Commerce's most recent decision for further explanation or reconsideration. *Mid Continent Steel & Wire, Inc. v. United States*, No. 15-00213, 2023 WL 2755657, at *7-8 (Ct. Int'l Trade Apr. 3, 2023). In the absence of an extension, Commerce's remand determination will be issued 90 days from April 3, 2023. ⌐

From the investigation through AR3, Commerce calculated rates of zero, zero, zero, 2.16 percent, 6.16 percent, 6.72 percent and 27.69 percent. All of these rates were below 35.30 percent, and only one rate, in AR3 (far removed from AR1 and not finalized when Commerce issued its redetermination) was close to 35.30 percent. The next closest rate (6.72 percent) was five times lower than 35.0 percent.

Moreover, in AR1, Commerce calculated margins for 12,542 PT/Pro-Team sales. Rates for two sales (0.016 percent of all sales) were greater than 100 percent, rates for 33 sales (0.263 percent) were between 10 – 20 percent, rates for 136 sales (1.084 percent) were between 5 – 9.99 percent, and rates for the remaining 12,371 sales (98.637 percent) were below 5 percent. **Appx6751, Appx6800.** Thus, margins on merely 0.016 percent of PT's sales (2 of 12,542) were greater than 35.3 percent, and margins on merely 0.279 percent (35 of 12,542) sales were greater than 10%. These sales specific rates constitute evidence that the 35.30 percent rate is not reasonable.

Support for Unicatch's position is found in the judicial decisions cited in Unicatch's Opening Brief, e.g., *Bosun Tools Co.*, 493 F. Supp. 3d at 1357, *aff'd* Case No. 2021-1930, 2022 WL 94172, at *6 (Fed. Cir. Jan. 10, 2022); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1373 (Fed. Cir. 2013);

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1378-79 (Fed. Cir. 2012); *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010); *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 971 F. Supp. 2d 1333, 1345 (Ct. Int'l Trade 2014); *Shenzhen Xinboda Industrial Co. Ltd. v. United States*, 180 F. Supp. 3d 1305, 1321 (Ct. Int'l Trade 2016); *Navneet Publications (India) Ltd. v. United States*, 999  F. Supp. 2d 1354, 1365 (Ct. Int'l Trade 2014); *Linyi Chengen Imp. & Exp. Co. v. United States*, 539 F. Supp. 3d 1269, 1278 (Ct. Int'l Trade 2021)[3]; *GODACO Seafood Joint Stock Co. v. United States*, 494 F. Supp. 3d 1294, 1306 (Ct. Int'l Trade 2021).

Neither the Government nor Mid Continent have provided this court with a valid reason to reject Unicatch's arguments and to affirm Commerce's decision. For example, on appeal of the trial court's decision in *Bosun Tools Co.*, 493 F. Supp. 3d at 1357, this Court carefully reviewed the record and affirmed Commerce's decision to calculate a 41.025 percent rate for non-selected companies

---

[3] On remand, Commerce continued to average the AFA and zero rates. The CIT expressly rejected this methodology. *Linyi Chengen Imp. & Exp. Co. v. United States*, 609 F. Supp. 3d 1392, 1404 (Ct. Int'l Trade 2022) (reasoning that "Commerce's determination to assign to fully cooperating separate rate respondents an all-others separate rate margin almost 60 times higher than the only investigated respondent, and half of the AFA rate for uncooperative respondents, is unreasonable as applied because it is unfair and unduly punitive," and advising "Commerce to not submit the same rate of 57.36% for the fourth time, which could likely result in yet another remand based on being unreasonable as applied to fully cooperating respondents if still based on a scarcity of record evidence.").

in the seventh annual review of an ADD Order based in part on Fengtai's AFA rate of 82.05 percent. *Bosun Tools Co. v. United States,* No. 2021-1930, 2022 WL 94172, at *5 (Fed. Cir. Jan. 10, 2022). In reaching this result, this Court noted that "the separate rates trended upward, from 4.83% in the third administrative review, to 12.05% in the fourth administrative review, to 39.66% in the fifth administrative review (which was also assigned to Bosun) . . . And, as Commerce pointed out, the 39.66% rate was 'almost the same' as the 41.025% rate." *Id*. The Court also noted "the 0% rate from the ninth administrative review was neither finalized nor on the administrative record during Commerce's review, which the Trade Court explained and Bosun does not dispute." *Id*. In the instant case, calculated rates in the Taiwan Nails investigation were 2.16 percent and zero; in AR 1, zero; and in AR 2 zero and 6.16 percent. All of these rates were significantly below 35.30 percent. And the only calculated rate close to 35.30 percent was in AR3, which was far removed from AR1, and was neither finalized nor on the administrative record during Commerce's AR1 review.

Both the Government and Mid Continent rely on this court's decision in *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) to support their position in this case. Gov. Br. at 8, 50, 51; Mid Continent Br. at passim. This reliance is misplaced. In fact, *Albemarle* supports HL/Romp's position. In *Albemarle,* Commerce rejected "the expected method (utilizing the

average of the margins calculated for the examined respondents) to calculate

separate rates for co-operating non-selected companies, reasoning that this

methodology "would not be reasonably reflective of potential dumping margins."

*Id.* at 1352. In its place Commerce carried forward respondents' margins from the

previous review. *Id.* As a result, the margins for these companies ranged from

$0.28/kg – $0.44/kg, rather than the zero-rate calculated for the two mandatory

respondents in the annual review subject to that litigation. *Id*. at 1355. The court

held that in light of these circumstances Commerce's decision to rely on higher

calculated rates from prior reviews was unreasonable. *Id*. at 1359. In its opinion,

this Court initially emphasized the principle that "accuracy and fairness must be

Commerce's primary objectives in calculating a separate rate for cooperating

exporters." *Id.* at 1354. It relied on the following decisions to support this position:

> *See Bestpak,* 716 F.3d at 1379 ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible."); *Gallant Ocean (Thailand) Co., v. United States,* 602 F.3d 1319, 1323 (Fed.Cir.2010) (a rate must be a "reasonably accurate estimate of the respondent's actual rate") (internal quotation marks and citations omitted); *SNR Roulements v. United States,* 402 F.3d 1358, 1363 (Fed.Cir.2005) ("Antidumping laws intend to calculate antidumping duties on a fair and equitable basis."); *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed.Cir.1990) (the "basic purpose of the statute" is to "determin[e] current margins as accurately as possible"); *see also Nan Ya,* 810 F.3d at 1344–45 (accuracy represents a "reliable guidepost[ ] for Commerce's determinations," and a determination is "accurate" if it is "supported by substantial evidence").

*Id.*

Next, the *Albemarle* court expressly noted that its decision to reject previously calculated rates would not apply in certain circumstances:

> To be sure, there are at least two circumstances where use of data from a prior period may be reasonable. But neither prevails here. . . Second, as the government points out, in the Adverse Facts Available ("AFA") context, where Commerce is allowed to consider deterrence as a factor, [12] we have upheld Commerce's use of data from a previous administrative review. . .. In other words, Commerce may presume that "a prior dumping margin imposed against an exporter in a prior dumping margin imposed against an exporter in an earlier administrative review continues to be valid if the exporter fails to *cooperate in a subsequent administrative review.*"

*Albemarle*, *supra* at 1357.

This discussion reveals that *Albemarle* does not support Commerce's decision to rely on a 78.17 percent total AFA rate to calculate HL/Romp's dumping margin.  To the contrary, by citing *Bestpak* and *Gallant* with approval*,* the *Albemarle* court expressed a strong preference to not rely on AFA rates. *Id*. at 1354. Furthermore, by noting that Commerce was allowed to look back to a prior review to deter a non-co-operative respondent, the court clearly did not suggest that Commerce had the authority to apply an AFA rate to a fully co-operating company. *Id*. at 1357.

Finally, in its recent administrative decisions, Commerce appears to have abandoned the policy being challenged in this litigation (i.e., weight averaging zero

and AFA rates and ignoring rates from prior reviews) and has relied on rates calculated in prior investigations and reviews to comply with its mandate to calculate reasonable rates for co-operating respondents. In *Wooden Cabinet and Vanities and Components Thereof From the People's Republic of China: Final Results and Partial Rescission of the Antidumping Duty Administrative Review; 2019-2021*, 87 Fed. Reg. 67,674 (Nov. 9, 2022), Commerce noted that "{w}e disagree with the petitioner that it is Commerce's "practice" to simple average a *de minimis* margin and the China-wide entity rate for the calculation of the separate rate." IDM at Cmt. 5. In *Certain Quartz Surface Products from India: Final Results of Antidumping Duty Administrative Review; 2019-2021*, 88 Fed. Reg. 1,188 (January 9, 2023), Commerce discussed its current policy as follows:

> In the underlying investigation, Commerce calculated weighted-average dumping margins for the mandatory respondents ranging from 2.67 to 5.15 percent. This resulted in an all-others margin of 3.19 percent. Moreover, the one fully calculated weighted-average dumping margin, for PESL, in this instant review is zero percent. Thus, we find that, other than the AFA rate we applied to Antique Group in the *Preliminary Results* (and continue to apply for these final results), all of the rates in this *Order* are significantly lower than the rate of 161.53 percent assigned to the non-selected companies in the *Preliminary Results*. Accordingly, based on the history of rates for this *Order*, we determine that the 161.53 percent margin is not reasonably reflective of the non-selected companies' potential dumping margins during the POR.. . . . In this instant case, we reviewed the *Order* history and determined that the facts lead to the conclusion that the expected method is not reasonably reflective of potential dumping margins for non-investigated exporters or producers.

IDM at Cmt. 5.

In sum, this court should reverse Commerce's decision to apply a 35.30 percent rate to HL/Romp – non-selected co-operative respondents – and should instead instruct Commerce to apply rates to these companies which were calculated for co-operative respondents in the initial investigation (zero and 2.16 percent), AR1 (zero) and/or AR2 (zero and 6.16 percent).

## <u>CONCLUSION</u>

For the reasons discussed in Plaintiffs-Appellants opening brief and this response brief, we respectfully request that this court remand this matter to the Department of Commerce with instructions to recalculate Unicatch, Romp and Hor Liang's antidumping duty margins based on the rationale set forth in this court's opinion.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak
Max F. Schutzman
Andrew T. Schutz*

GRUNFELD, DESIDERIO,
LEBOWITZ SILVERMAN &
KLESTADT LLP

599 Lexington Avenue-36th Floor
New York, NY 10022
(212) 557-4400

*1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated: June 2, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains less than 7,000 words. This brief contains 6,682 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.

<u>Dated: June 2, 2023</u>                 */s/ Ned H. Marshak*
                                        Ned. H. Marshak